781 So.2d 1070 (2001)
Gary HERZFELD, Petitioner,
v.
Frank HERZFELD, Respondent.
No. SC95054.
Supreme Court of Florida.
March 15, 2001.
*1071 Sharon L. Kegerreis and Mayda Prego of Hughes, Hubbard & Reed LLP, Miami, FL, for Petitioner.
David C. Rash, North Miami Beach, FL, for Respondent.
ANSTEAD, J.
We have for review the opinion in Herzfeld v. Herzfeld, 732 So.2d 1102 (Fla. 3d DCA 1999), which certified conflict with the opinion in Richards v. Richards, 599 So.2d 135 (Fla. 5th DCA 1992). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. At issue in this case is whether the public policies served by the parental immunity doctrine continue to support its valid application to claims of sexual abuse by a parent against a child. Because we find that in such cases family harmony is already substantially diminished, and the remaining relevant policy considerations are insufficient to support application of the doctrine to these circumstances, we approve the decision in Herzfeld.

PRIOR PROCEEDINGS
The intentional torts alleged here are: (1) assault and battery; (2) false imprisonment; and (3) intentional infliction of emotional distress, all based on allegations of sexual abuse. The facts underlying the alleged abuse by the parent against the child are summarized in the Third District's opinion as follows:
The plaintiff [minor child] was placed in the defendant's care as a foster child in 1988. The defendant adopted the plaintiff three years later when the plaintiff was sixteen years old. On June 5, 1997, the plaintiff filed a four count civil complaint against the defendant, alleging repeated sexual abuse. The plaintiff alleged intentional torts in counts I through III, and negligence in count IV.
The trial court granted the defendant's motion to dismiss counts I through III on the ground that intentional tort claims are barred by the parental immunity doctrine. After finding that the defendant's insurance policy [did] not cover the plaintiffs negligence claim, the trial court also found the parental immunity doctrine applicable to count IV and granted the defendant's motion for summary judgment on that count. *1072 Herzfeld, 732 So.2d at 1103. The minor child appealed the trial court's orders granting his adoptive father's motions to dismiss and for summary judgment. In an opinion containing a comprehensive and thorough analysis authored by Judge Gersten, the Third District reversed and held that because family harmony is already destroyed in sexual abuse cases, "the parental immunity doctrine does not bar the action by the minor child against his parent for damages arising from sexual abuse." Id. Notwithstanding, the court acknowledged that its ruling was in direct conflict with Richards v. Richards, 599 So.2d 135 (Fla. 5th DCA 1992), which held that parental immunity barred a similar intentional tort suit by a child against his father predicated upon the father's alleged sexual assaults. We approve Judge Gersten's opinion and the decision of the Third District.

FAMILY MEMBERS' IMMUNITY
As noted, Judge Gersten's opinion contains a thorough analysis, and we borrow from much of that analysis here. Legal commentators note that the rule granting parents legal immunity from tort actions brought by their children does not have its origins or any long roots in the English common law, but appears, rather, to have been created by American state courts. Commentators trace the rule's origin to an opinion of the Mississippi Supreme Court decided in 1891. The case involved a young married woman, separated from her husband at the time, who sued her mother for wrongfully confining her to an insane asylum when she was a minor.[1]See Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891). In reviewing the young woman's claim, the court noted that "so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained." Id. at 887. The court explained its rationale:
The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand.
Id.[2] The doctrine was accepted and further developed in opinions by the Supreme Courts of Tennessee and Washington, and later by other state courts. See Roller v. Roller, 37 Wash. 242, 79 P. 788 (1905), overruled in part by Borst v. Borst, 41 Wash.2d 642, 251 P.2d 149 (1952); McKelvey v. McKelvey, 111 Tenn. 388, 77 S.W. 664 (1903), overruled by Broadwell v. Holmes, 871 S.W.2d 471 (Tenn.1994).
In McKelvey, the Tennessee Supreme Court reasoned that allowing a minor's suit would interfere with public policy supporting discretionary parental control and discipline. See McKelvey, 77 S.W. at 664-65. In Roller, the Supreme Court of Washington emphasized its concerns that no practical line could be developed to separate meritorious claims *1073 from those based on actions properly and routinely taken by a parent against a child as part of the exercise of a broad parental discretion.[3]See Roller, 79 P. at 789. Other courts have added a concern of the possibility of fraud and collusion between family members and the depletion of family resources as additional rationales for the immunity doctrine.[4] However, the concern with family integrity has remained at the core of the doctrine.

RECENT TRENDS
Although the majority of states in this country initially adopted the parental immunity doctrine in varying degrees,[5] many have now either abrogated the doctrine completely[6] or have established significant exceptions to its application.[7] Those courts have reexamined and, in many instances, rejected outright the public policy rationales originally asserted in support of the doctrine. For example, in Guess v. Gulf Ins. Co., 96 N.M. 27, 627 P.2d 869, 871 (1981), the New Mexico Supreme Court concluded that family relationships are affected to a far greater extent by the misconduct of the party against whom the suit is filed than by the legal action based on that misconduct. And, in Gibson v. Gibson, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648 (1971), the California Supreme Court held that the policy reasons originally cited in support of the doctrine had been demonstrated to be insufficient to sustain a *1074 continued total bar to parent-child suits based upon wrongful conduct:
We think that the reasoning of those decisions [abrogating the doctrine] has totally destroyed two of the three grounds traditionally advanced in support of parental immunity: (1) disruption of family harmony and (2) fraud or collusion between family "adversaries." The third ground, the threat to parental authority and discipline, although of legitimate concern, cannot sustain a total bar to parent-child negligence suits.
Id., 92 Cal.Rptr. 288, 479 P.2d at 651; see also Shearer v. Shearer, 18 Ohio St.3d 94, 480 N.E.2d 388, 391 (1985) (stating that "[i]f the elimination of parental immunity were a bad legal position, one would reasonably expect to find that those states [that have now rejected the doctrine after initially adopting it] were experiencing problems with the abrogation ... [and] there is no evidence or persuasive material that any of these states [that never adopted the doctrine] ever suffered adverse consequences for the lack of such a rule"). Other courts have partially retreated from use of the doctrine and have held it should not apply in circumstances which include negligence claims involving accidents covered by liability insurance,[8] or some intentional tort claims.[9]
Abrogation of the parental immunity doctrine in accident cases has been largely based on the prevalence of liability insurance. Importantly, the courts have emphasized that the domestic harmony policy concern is diminished under these circumstances because the injured child's dispute is actually with the financially responsible insurance carrier rather than with the parents. See Streenz v. Streenz, 106 Ariz. 86, 471 P.2d 282, 284 (1970) ("Where such insurance exists, the domestic tranquility argument is hollow, for in reality the sought after litigation is not between child and parent but between child and parent's insurance carrier."), overruled on other grounds by Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43 (1995). The courts have also noted that allowing recovery against an insurance fund would not impact family assets. See Sorensen v. Sorensen, 369 Mass. 350, 339 N.E.2d 907, 914 (1975) (stating that "when insurance is involved,... both parties seek recovery from the insurance carrier to create a fund for the child's medical care and support without depleting the family's other assets").[10] *1075 Similarly, claims that fraud would increase in such cases have been rejected either outright as no greater than concerns about fraud in any litigation, or as insufficiently demonstrated. See, e.g., Glaskox v. Glaskox, 614 So.2d 906, 912 (Miss.1992); Kirchner v. Crystal, 15 Ohio St.3d 326, 474 N.E.2d 275, 278 (1984).

CHILD SEXUAL ABUSE EXCEPTION
Notably, some courts have created specific exceptions to the parental immunity doctrine for sexual abuse cases.[11]See, e.g., Henderson v. Woolley, 230 Conn. 472, 644 A.2d 1303 (1994); Hurst v. Capitell, 539 So.2d 264, 266 (Ala.1989); Doe v. Holt, 332 N.C. 90, 418 S.E.2d 511 (1992); Wilson v. Wilson, 742 F.2d 1004, 1005 (6th Cir.1984). However, courts have sometimes reached different conclusions depending on whether such claims are raised in a negligence or intentional tort context.[12]
For instance, in Robinson v. Robinson, 323 Ark. 224, 914 S.W.2d 292 (1996), a child brought an intentional tort suit against her father based on sexual abuse committed during her minority and a separate negligence claim against her mother for failing to prevent such abuse. The child prevailed at trial. See id. at 293. Upon review, the Arkansas Supreme Court held that it would continue to recognize parental immunity for negligence claims. See id. at 293. However, while remanding for a new trial, the court nevertheless allowed the intentional tort suit to go forward, recognizing that under Arkansas law, parental immunity does not preclude minors from suing their parents for willful and wanton sexual abuse. See id. Similarly, in McGee v. McGee, 936 S.W.2d 360 (Tex.App.1996), the Texas court recognized an exception to the parental immunity doctrine for the minor's claims of intentional sexual assault, while holding that the negligence claims were barred by the doctrine.[13]See id. at 367.
Other courts have not only permitted intentional tort claims but also those based on negligence against a parent for not protecting the child or preventing the sexual abuse. See Spikes v. Banks, 231 Mich. App. 341, 586 N.W.2d 106, 112 (1998) (stating that foster parent's failure to prevent sexual abuse by parent's nephew was not an exercise of reasonable parental discretion and therefore parent was not entitled to avail herself of the parental immunity doctrine); Phillips v. Deihm, 213 Mich. App. 389, 541 N.W.2d 566 (1995) (finding *1076 that grandfather's wife's failure to act to prevent the sexual abuse by grandfather against minor was not a reasonable exercise of parental discretion; therefore, wife was not entitled to parental immunity).
It is apparent that courts have expressed a special concern about the continued application of the parental immunity doctrine to defeat intentional sexual abuse claims. For example, in Hurst, a minor sued her stepfather and natural mother for damages based on sexual abuse. See Hurst, 539 So.2d at 265. In allowing the suits to proceed, the court created an exception for sexual abuse cases, explaining: "[T]o leave children who are victims of such wrongful, intentional, heinous acts [sexual abuse acts] without a right to redress those wrongs in a civil action is unconscionable, especially where the harm to the family fabric has already occurred through that abuse." Id. at 266. Similarly, the Supreme Court of Connecticut conducted a comprehensive reevaluation of the doctrine in Henderson, and, relying primarily on the authority of Hurst and Doe, declared:
[W]e do not believe that the purpose of the doctrine would be served by extending it to shield a parent from a civil action alleging sexual abuse. Familial discord or dysfunction obviously exists where parental sexual abuse occurs. Therefore, the purpose of the preservation of family harmony cannot justify immunity in the case of sexual abuse of a child by a parent.
Furthermore, there is a point at which parental conduct properly becomes a matter of public concern, and sexual abuse, assault and exploitation are well within that realm. When a parent perpetrates such a crime upon his or her child, that act constitutes a breach of duty owed not only to the child, but to the public at large, and there is no reason to immunize such conduct from a civil action in damages merely because of the familial relationship.
Henderson, 644 A.2d at 1307 (citations omitted). Further, in response to the often-cited premise from Hewellette that minors can obtain redress through the criminal justice system, the court noted:
[R]edress is not necessarily available for this type of misconduct through the criminal justice system [because] [t]he conduct may not be brought to the attention of the state within the time limits of the criminal statute of limitations because of the child's continued dependency on the parent. Also, the child may not recognize the wrong for many years because children often accept unquestioningly the actions of their parents. Finally, as in the present case, the plaintiff may allege facts that are claimed to have been blocked from conscious memory for many years.
Id. (footnote omitted).

FLORIDA LAW
It appears that the parent-child immunity doctrine was first discussed in a Florida appellate opinion in 1961. In Meehan v. Meehan, 133 So.2d 776 (Fla. 2d DCA 1961), a father sued his minor son for the wrongful death of another one of his minor sons. While observing that no other Florida case could be found that had addressed the question, the court held that the father's action was barred, relying on the view already adopted in other states barring parents from maintaining tort actions against an unemancipated minor child. See id. at 777. The court relied upon the often cited concerns relating to the encouragement of family unity and the maintenance of family discipline as sufficient public policy reasons to support the ban. See id. In 1967, the Second District again applied the doctrine to bar a negligence *1077 suit by a minor child against his parents and discussed the public policy concerns:
This rule [parental immunity], like that forbidding at common law the bringing of an action by a wife against her husband for a personal tort, is not the product of any inherent disability of the child to sue its parent, but rather is based upon the interest that society has in preserving harmony in the domestic relations. It is said that the rule is not an absolute one, but exists only where the suit would disturb the family relations.
Richard v. Richard, 203 So.2d 7, 8 (Fla. 2d DCA 1967) (quoting 39 Am.Jur. Parent and Child § 90).

OREFICE
Subsequently, this Court followed the precedent set by the district court and held that permitting tort suits between members of a family unit would be inconsistent with Florida public policy favoring the integrity of the family. See Orefice v. Albert, 237 So.2d 142, 145 (Fla.1970). The Court emphasized that the major purpose of the rule, including the bar of suits between children and parents, was to protect family harmony and resources. See id. The family immunity doctrine as adopted in Orefice remained unchanged in Florida until 1982 and this Court's decision in Ard v. Ard, 414 So.2d 1066 (Fla.1982).
In Ard this Court carved out an exception to the parental immunity doctrine for negligence actions brought by a minor child against a parent who was protected by liability insurance for the incident giving rise to the action. See Ard, 414 So.2d at 1067. Importantly, we noted the trend among other states toward abrogating or limiting parental immunity where changes in the contemporary conditions and life diminished the strength of the policies supporting the doctrine.[14]See id. at 1067-68. We recognized, for example, that many states had long since created an exception to the doctrine in cases dealing with the negligent operation of a motor vehicle by a parent where there was liability insurance covering such incidents. See id. This Court also rejected the potential for fraud or collusion by family members as a valid reason to refuse to recognize any exceptions to the doctrine, noting that the potential for fraud generally existed in any lawsuit. See id. at 1069.[15]

INTENTIONAL SEXUAL TORTS
After carefully evaluating the policies behind the parental immunity doctrine, the national trends, and our own prior case law, we conclude that the district court was correct in holding that the policies relied upon to support the doctrine are insufficient to continue application of the doctrine to bar intentional sexual tort claims by a child against a parent. We *1078 agree with the district court that the fear of disrupting the fabric and nucleus of families by allowing actions based upon intentional sexual abuse simply appears to be without merit. If indeed the principal reason for the parental immunity doctrine is to preserve family harmony, then it appears that the immunity can have no justification in such cases of intentional and malicious sexual abuse, for in those cases the inescapable conclusion is that the family fabric has already been tragically disrupted by the serious misconduct alleged. We agree that the mere additional stress of a lawsuit in such circumstances is an insufficient reason by itself to bar a claim for that misconduct.
Further, while we have genuine concerns that some may abuse the judicial system through false claims in domestic relations cases as well as tort cases, we believe the protections available in the judicial process are adequate to address the issue of false or fraudulent claims in this context as well as others. We find the depletion of family resources argument unpersuasive as well. As was noted by the court below, it is apparent that the depletion of family resources by itself cannot justify the parental immunity theory, since "any time a person is sued for actions not covered by liability insurance, his or her family's resources are threatened." Herzfeld, 732 So.2d at 1106.[16]
The petitioner-father asserts that the Legislature rather than the judiciary is the only branch of government with the authority to make such a change to the application of the doctrine. We disagree. As was noted by Justice Harding in his concurrence in Waite, because the "doctrine of interspousal immunity is rooted in the common law and is not a statutory creation[,] ... it is appropriate for this Court to abrogate the doctrine rather than defer to legislative action." Waite, 618 So.2d at 1362; see also Hurst v. Capitell, 539 So.2d 264, 266 (Ala.1989) ("Because the [parental immunity] doctrine was judicially created, it is not exclusively a legislative issue and it may be judicially qualified."); Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193, 198 (1963). In Waite, this Court recognized that the "common law will not be altered or expanded by this Court unless demanded by public policy necessity or to vindicate fundamental rights." Waite, 618 So.2d at 1361. As in Waite, however, we conclude that public policy, as well as the vindication of fundamental rights, requires our action here. Therefore, because the parental immunity doctrine was judicially created, we have not only the authority to abrogate it, but an affirmative duty to review the wisdom of continuing to maintain it in the challenged circumstances.[17]

*1079 CONCLUSION
In sum, we are in essential agreement with the view expressed by the North Carolina Supreme Court in Doe:
It would be unconscionable if children who were injured by heinous acts [sexual abuse acts] of their parents such as alleged here should have no avenue by which to recover damages in redress of those wrongs. Where a parent has injured his or her child through a willful and malicious act, any concept of family harmony has been destroyed. Thus, the foremost public purpose supporting the parent-child immunity doctrine is absent, and there is no reason to extend the doctrine's protection to such acts.
We wish to make it clear that no issue involving reasonable chastisement of children by their parents is before us in the present case, and we expressly do not intend to be understood as commenting on situations involving such issues. Furthermore, our opinion in the present case is not intended to permit interference in the proper scope of discretion parents must utilize in rearing their children. As the Supreme Court of New Jersey recognized in Foldi, there is no universally correct philosophy on how to raise one's child. In no way do we intend to indicate that reasonable parental decisions concerning children should be reviewed in the courts of this state. Such decisions make up the essence of parental discretion, discretion which allows parents to shape the views, beliefs and values their children carry with them into adulthood. These decisions are for the parents to make, and will be protected as such.
Doe, 418 S.E.2d at 514-15 (citations omitted).
Accordingly, because we find that the policies behind the parental immunity doctrine are insufficient to justify barring a minor from recovering for intentional sexual abuse perpetrated by a parent, we approve the opinion and decision below and disapprove Richards.
It is so ordered.
SHAW, PARIENTE, LEWIS and QUINCE, JJ., concur.
HARDING, J., concurs with an opinion, in which ANSTEAD, PARIENTE and LEWIS, JJ., concur.
WELLS, C.J., dissents with an opinion.
HARDING, J., concurring.
I agree with the majority's decision to abrogate the doctrine of parental immunity for sexual abuse claims brought by children. While alterations of the common law are rarely entertained or allowed, they are within this Court's prerogative. See In re T.A.C.P., 609 So.2d 588, 594 (Fla. 1992). However, the common law will only be altered or expanded when demanded by public necessity or where required to vindicate fundamental rights. Id. at 595 (finding no basis to expand the common law to equate anencephaly with death); Waite v. Waite, 618 So.2d 1360 (Fla.1993) *1080 (abrogating the common law doctrine of interspousal immunity).
As explained in Raisen v. Raisen, 379 So.2d 352, 353 (Fla.1979), the doctrine of interspousal tort immunity was originally a part of the common law of England and was adopted into the law of Florida in 1829 by the enactment of what is now section 2.01, Florida Statutes.[18] "As a general rule, that part of the common law codified by section 2.01 should be changed through legislative enactment and not by judicial decision. Only in very few instances and with great hesitation has this Court modified or abrogated any part of the common law enacted by section 2.01, and then only where there was a compelling need for the change and the reason for the law no longer existed." Id. at 353-54.
In contrast, the doctrine of parent-child immunity did not have its origin in the common law of England, but rather can be traced back to the 1891 Mississippi case of Hewellette v. George, 68 Miss. 703, 9 So. 885 (1891). The Mississippi Supreme Court based its decision on the "peace of society ... [and] the repose of families." Id. at 887. It appears that Florida case law did not discuss the doctrine until the 1960s. See Richard v. Richard, 203 So.2d 7, 8 (Fla. 2d DCA 1967) (applying doctrine to bar negligence suit by minor child against parents) Meehan v. Meehan, 133 So.2d 776, 777 (Fla. 2d DCA 1961) (relying on "view of the majority of states" to conclude that father's suit against minor son for wrongful death of another minor son was barred). In 1970, this Court stated that it is "established policy ... that suits will not be allowed in this state among members of a family unit for tort. Spouses may not sue each other, nor children their parents. The purpose of this policy is to protect family harmony and resources." Orefice v. Albert, 237 So.2d 142, 145 (Fla.1970) (holding that neither mother nor estate of decedent minor child could maintain suit against father for negligence). However, in 1982, this Court waived the doctrine of parental immunity in tort actions for negligence brought by an unemancipated minor child where the negligence arose from an accident and to the extent of the parent's available liability insurance coverage. See Ard v. Ard, 414 So.2d 1066, 1067 (Fla.1982). The Court noted that the public policy reasons behind parental immunity (preservation of domestic harmony and tranquility; depletion of family assets in favor of the claimant at the expense of the other family members; danger of fraud and collusion between the parent and child when insurance is involved; interference with parental care, discipline, and control; and the possibility of inheritance by the parent of the amount recovered by the child) were changed by the development and widespread use of liability insurance. See id. at 1068. The Court concluded that where insurance is involved the action between parent and child is not truly adversary and the action is more likely to preserve the family unit as the insurance assets are likely to ease financial difficulties stemming from the family member's injuries. See id. at 1068-69. The Court also noted that the possibility of fraud exists in every lawsuit and should not be the basis for denying a child compensation for negligent injuries. See id. at 1069. Finally, the Court cited a number of instances where Florida Statutes have waived immunity when there is liability insurance. See id. Accordingly, the Court, and not the Legislature, abrogated the doctrine of parental immunity to the extent of available insurance coverage. See id. at 1070.
*1081 In Waite, this Court completely abrogated the doctrine of interspousal immunity even though it had been adopted into the law of Florida in 1829 by section 2.01. The Court concluded that the public policy reasons for applying the doctrine were no longer applicable and that both public necessity and the vindication of fundamental rights demanded this abrogation. See Waite, 618 So.2d at 1361.
In light of the fact that parental immunity is totally judicial in origin, there is even less reason for this Court to defer to legislative action in abrogating the doctrine. Thus, the real issue is whether the policy reasons underlying parental immunity are still valid. The Court has already abrogated parental immunity for negligence actions to the extent of liability insurance coverage. See Ard. W. Page Keeton, a respected authority on American tort law, has observed that the very act of creating exceptions to a doctrine renders the doctrine increasingly less justifiable. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 122, at 902-04 (5th ed.1984). Moreover, Keeton has criticized that the retreat from the doctrine of parental immunity has lagged behind the abrogation of interspousal immunity when there is "no shadow of a difference in principle or policy" between the doctrines. Id. at 906. Thus, the judicial whittling down of parental immunity and the complete abrogation of interspousal immunity both cut in favor of judicial abolishment of parental immunity in Florida.
The Wisconsin Supreme Court abolished parent-child immunity nearly forty years ago. See Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963). Other states have followed suit by either completely abrogating the doctrine or establishing significant exceptions to its application. See majority op. at 1073-74 and accompanying footnotes.
The majority advocates a progressive and compassionate judicial course in the instant case: the abrogation of parental immunity for all claims of sexual abuse raised by a child against a parent. The majority notes that in cases of intentional and malicious sexual abuse "the family fabric has already been tragically disrupted" and there is no family harmony to preserve. Majority op. at 1078. "[T]he mere additional stress of a lawsuit in such circumstances is an insufficient reason by itself to bar a claim for that misconduct." Id. This is almost identical to the reasoning behind this Court's decision in Waite, i.e., "marital harmony" is already disrupted where one partner commits a wrong against the other. See Waite, 618 So.2d at 1361.
Based upon this Court's reasoning in Waite, the history of parental immunity, and the actions of other states, I believe the time has come to completely abrogate the doctrine of parental immunity for claims of intentional sexual abuse brought by children in Florida. Accordingly, I join in the majority's first step in this case.
ANSTEAD, PARIENTE and LEWIS, JJ., concur.
WELLS, C.J., dissenting.
I would quash Herzfeld v. Herzfeld, 732 So.2d 1102 (Fla. 3d DCA 1999), and approve Richards v. Richards, 599 So.2d 135 (Fla. 5th DCA 1992).
This Court's precedent is to uphold family immunity except in the limited instance set out in Ard v. Ard, 414 So.2d 1066 (Fla.1982). That policy has served the state for a long period, and disturbing it has not been justified.
I am concerned that this decision will be used to foster litigation involving children in stances in which the real battle is between the two parents. Although I certainly *1082 agree with dealing harshly with parents who abuse their childrensexually, physically, mentally, or emotionallyI find a great deal of wisdom in Judge Cobb's opinion in Richards:
Recovery against a parent by an individual child for an intentional tort, where insurance is not available, decreases the assets available for the support of other family members who may also be in need of assistance. Moreover, the majority of any punitive damage recovery by the child/plaintiff would pass to the state, further depleting family assets.
We also note that opening the doors to tort actions for damages by children against parents would avail an unscrupulous parent of the opportunity to manipulate a minor child and the legal system by bringing frivolous actions against the other parent. The criminal court, rather than the civil court, is better equipped to process charges such as those leveled in the instant case. As succinctly pointed out in the appellee's brief:
The benefits to be gained by a child's intentional tort action against a parent do not justify abrogating the parent/child immunity doctrine. If a parent abuses a minor child, the parent is already obligated by law to provide the minor child with all necessary care, including medical and psychological care. The law also recognizes the child's right to enforce this obligation. It is not necessary that the child be given the right to sue a parent for intentional tort for the obligation to be enforced. The parent's obligation to provide for the child also continues beyond the age of majority if the child is unable to provide for himself or herself as a result of a physical or psychological disability.
. . . .
If the parent/child immunity doctrine is to be abrogated to allow a child to bring an intentional tort action against a parent, it should be done by statute. The legislative setting is better equipped to solve such a complex social issue as that presented by this case. In a legislative setting the whole spectrum of compelling interests can be considered, and a broad solution can be crafted. In the judicial setting, the complex social issue of sexual abuse comes before the court upon a set of facts by a single case.
Richards v. Richards, 599 So.2d at 136-37.
NOTES
[1] The court found the daughter unemancipated even though she was married because the necessary parent-child relationship was intact at the time the incident subject of the suit occurred.
[2] The doctrine has since been partially abrogated in Mississippi in the context of automobile accident cases in which a minor child was injured as a result of a parent's negligent operation of a vehicle. See Glaskox v. Glaskox, 614 So.2d 906 (Miss.1992).
[3] The adoption and expansion of the doctrine by these three cases is referred to by some legal writers and commentators as "the great trilogy" of cases in the development of the parental immunity doctrine. See, e.g., William E. McCurdy, Torts Between Parents and Child, 5 Vill. L.Rev. 521 (1960).
[4] See, e.g., Richards v. Richards, 599 So.2d 135, 136 (Fla. 5th DCA 1992); Wagner v. Smith, 340 N.W.2d 255, 256-57 (Iowa 1983); Nocktonick v. Nocktonick, 227 Kan. 758, 611 P.2d 135, 137 (1980).
[5] The following seven jurisdictions never adopted the doctrine or explicitly refused to recognize it: District of Columbia, Hawaii, Nevada, North Dakota, Utah and Vermont. See Rousey v. Rousey, 528 A.2d 416 (D.C. 1987); Petersen v. City & County of Honolulu, 51 Haw. 484, 462 P.2d 1007 (1969); Rupert v. Stienne, 90 Nev. 397, 528 P.2d 1013 (1974); Nuelle v. Wells, 154 N.W.2d 364, 366 (N.D. 1967); Elkington v. Foust, 618 P.2d 37, 40 (Utah 1980); Wood v. Wood, 135 Vt. 119, 370 A.2d 191, 193 (1977). South Dakota appears to have never addressed it.
[6] Eleven states have abrogated the doctrine completely: Arizona, California, Minnesota, Missouri, New Hampshire, New Mexico, New York, Ohio, Oregon, Pennsylvania, and South Carolina. See Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43, 50 (1995); Emery v. Emery, 45 Cal.2d 421, 289 P.2d 218 (1955) (abrogating doctrine for intentional or malicious torts), Gibson v. Gibson, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648, 653 (1971) (abrogating doctrine for negligence suits); Anderson v. Stream, 295 N.W.2d 595, 601 (Minn.1980); Hartman v. Hartman, 821 S.W.2d 852, 858 (Mo.1991); Briere v. Briere, 107 N.H. 432, 224 A.2d 588, 591 (1966); Guess v. Gulf Ins. Co., 96 N.M. 27, 627 P.2d 869, 871 (1981); Gelbman v. Gelbman, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192, 194 (1969); Kirchner v. Crystal, 15 Ohio St.3d 326, 474 N.E.2d 275 (1984); Winn v. Gilroy, 296 Or. 718, 681 P.2d 776, 785 (1984); Falco v. Pados, 444 Pa. 372, 282 A.2d 351, 353 (1971); Elam v. Elam, 275 S.C. 132, 268 S.E.2d 109, 112 (1980).

Some of these jurisdictions have adopted a standard of care evaluating what an ordinarily reasonable and prudent parent would have done in similar circumstances. See, e.g., Broadbent v. Broadbent, 184 Ariz. 74, 907 P.2d 43, 50 (1995); Gibson v. Gibson, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648, 653 (1971); Anderson v. Stream, 295 N.W.2d 595, 601 (Minn.1980); Hartman v. Hartman, 821 S.W.2d 852, 855-57 (Mo.1991).
[7] Thirty-two states have established exceptions to the doctrine. In fact, Louisiana appears to be the only state that continues to apply the doctrine as it was originally formulated. See La.Rev.Stat.Ann. 9:571 (1997).
[8] See, e.g. Hebel v. Hebel, 435 P.2d 8 (Alaska 1967); Williams v. Williams, 369 A.2d 669 (Del.1976); Ard v. Ard, 414 So.2d 1066 (Fla. 1982); Nocktonick v. Nocktonick, 227 Kan. 758, 611 P.2d 135 (1980); Black v. Solmitz, 409 A.2d 634 (Me.1979); Sorensen v. Sorensen, 369 Mass. 350, 339 N.E.2d 907 (1975); Glaskox v. Glaskox, 614 So.2d 906 (Miss. 1992); France v. A.P.A. Transp. Corp., 56 N.J. 500, 267 A.2d 490 (1970); Unah v. Martin, 676 P.2d 1366 (Okla.1984); Silva v. Silva, 446 A.2d 1013 (R.I.1982); Jilani v. Jilani, 767 S.W.2d 671 (Tex.1988); Smith v. Kauffman, 212 Va. 181, 183 S.E.2d 190 (1971); Merrick v. Sutterlin, 93 Wash.2d 411, 610 P.2d 891 (1980); Lee v. Comer, 159 W.Va. 585, 224 S.E.2d 721 (1976); Dellapenta v. Dellapenta, 838 P.2d 1153 (Wyo.1992).
[9] See, e.g., Hurst v. Capitell, 539 So.2d 264 (Ala.1989); Attwood v. Estate of Attwood, 276 Ark. 230, 633 S.W.2d 366 (1982); Schlessinger v. Schlessinger, 796 P.2d 1385 (Colo.1990); Henderson v. Woolley, 230 Conn. 472, 644 A.2d 1303 (1994); Wright v. Wright, 85 Ga. App. 721, 70 S.E.2d 152 (1952); Nudd v. Matsoukas, 7 Ill.2d 608, 131 N.E.2d 525 (1956); Mahnke v. Moore, 197 Md. 61, 77 A.2d 923 (1951); Pullen v. Novak, 169 Neb. 211, 99 N.W.2d 16 (1959); Foldi v. Jeffries, 93 N.J. 533, 461 A.2d 1145 (1983); Doe v. Holt, 332 N.C. 90, 418 S.E.2d 511 (1992); Sixkiller v. Summers, 680 P.2d 360 (Okla.1984); Pavlick v. Pavlick, 254 Va. 176, 491 S.E.2d 602 (1997); Jenkins v. Snohomish County Public Utility Dist. No. 1, 105 Wash.2d 99, 713 P.2d 79 (1986); Courtney v. Courtney, 186 W.Va. 597, 413 S.E.2d 418 (1991); Oldman v. Bartshe, 480 P.2d 99 (Wyo.1971).
[10] This Court relied heavily on both of these cases in recognizing an automobile insurance exception to the parental immunity doctrine in Ard v. Ard, 414 So.2d 1066 (Fla.1982).
[11] There also appears to be a trend in state courts toward recognizing an exception to the immunity doctrine for unemancipated minor children injured by the intentional torts of a parent. See, e.g., Attwood v. Estate of Attwood, 276 Ark. 230, 633 S.W.2d 366 (1982); Foldi v. Jeffries, 93 N.J. 533, 461 A.2d 1145 (1983); Elkington v. Foust, 618 P.2d 37 (Utah 1980).
[12] A claim arises in negligence most often as an allegation that a parent failed to protect or prevent the child from sexual abuse by another person, including the other parent. See, e.g. Robinson v. Robinson, 323 Ark. 224, 914 S.W.2d 292 (1996) (negligence suit filed by child against her mother for mother's failure to prevent sexual abuse by father); Phinney v. Morgan, 39 Mass.App.Ct. 202, 654 N.E.2d 77 (1995) (same). As an intentional tort, the claim is usually asserted directly against the abusing parent as in this case. See Robinson, 914 S.W.2d at 293 (intentional tort suit brought by child against father for sexual abuse committed during child's minority).
[13] Texas has recognized three exceptions to the doctrine: (1) intentional or malicious acts; (2) acts committed by parents in an employer-employee relationship with their child; and (3) the negligent operation of an automobile. See McGee, 936 S.W.2d at 367.
[14] At the time the opinion was released, twenty-four states had either limited or abolished the application of the doctrine. See Ard, 414 So.2d at 1068, n. 4.
[15] In Waite v. Waite, 618 So.2d 1360 (Fla. 1993), we rejected concerns about marital discord and fraud in concluding that the interspousal immunity doctrine should be abolished. We concluded that there was no basis to believe that married couples were more likely to commit fraud against insurers than anyone else, and that no additional marital discord was likely to occur beyond that brought about by the circumstances which gave rise to the tort suit itself. See id. at 1361. Because the policy considerations underlying the parental immunity doctrine are similar to those that supported the interspousal immunity doctrine, it is not surprising to find they are often treated alike by courts and commentators. See Goller v. White, 20 Wis.2d 402, 122 N.W.2d 193 (1963) (looking back on thirty-five years since the abrogation of interspousal immunity to predict possible effect of abrogating parental immunity).
[16] As a final and alternative point, the minor in this case argues that the trial court erred in even applying the parental immunity doctrine to bar his suit because he was at least twenty years old when he filed it and the doctrine only precludes suits by unemancipated minor children. We find this argument to be without merit. Although the parental immunity doctrine only applies to suits filed by minors, the child's argument is contrary to numerous cases holding that the relevant measuring period is from the time when the alleged misconduct occurred, not the time that the actual suit was filed. See, e.g., Robinson v. Robinson, 323 Ark. 224, 914 S.W.2d 292, 294 (1996) (holding that doctrine was applicable to the child's case because although she had attained her legal age when the action was commenced, she was an unemancipated minor at the time of the alleged tort); Henderson v. Woolley, 230 Conn. 472, 644 A.2d 1303 (1994) (analyzing the parental immunity doctrine based on claim brought by a thirty-three-year-old plaintiff who alleged to have been sexually abused by her father from the age of four until she turned fourteen).
[17] Although the minor child encourages us to completely abrogate the doctrine for all torts, we decline his invitation to do so at this time. Several years ago in Ard, this Court was presented with the question of whether to abrogate the doctrine in negligence actions. After extensively analyzing the policy considerations justifying the parental immunity doctrine in the negligence context, the Court found that although the doctrine was no longer justified in cases where the parent had insurance, it was still applicable to bar other claims. See Ard, 414 So.2d at 1067. Because we continue to recognize a significant distinction between intentional and negligent acts, as well as the possible threat of disruption that claims of simple negligence can have on the family unit and on parents' rights to discipline their children, we decline to consider the application of the doctrine in other contexts at this time.
[18] Section 2.01, Florida Statutes (1999), incorporates the common and statute laws of England in force on July 4, 1776, as the law in Florida.