NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

SARAH JERRELS, as personal )
representative of the Estate of Dylan )
Jerrels, )
)
Appellant, )
)
v. ) Case No. 2D18-992
)
SABRINA JERRELS, as personal )
representative of the Estate of Jasper W. )
Jerrels, Jr.; and SIMONE SINGLETARY )
KENYON, as personal representative of the )
Estate of Hue Pham Singletary, )
)
Appellees. )
_____ )

Opinion filed June 12, 2019.

Appeal from the Circuit Court for
Hillsborough County; Catherine M. Catlin,
Judge.

Eric D. Nowak of McBreen & Nowak, P.A.,
Tampa; and Tae K. Bronner of Tae Kelly
Bronner, P.L., Tampa, for Appellant.

David D. Dickey of The Yerrid Law Firm,
Tampa, for Appellee Simone Singletary
Kenyon.

No appearance for remaining Appellee.

LaROSE, Chief Judge.

Sarah Jerrels, the personal representative of her son's estate, appeals the trial court's order limiting the scope of the wrongful death claim brought on behalf of Dylan Jerrels' estate against the estate of his father, Jasper W. Jerrels. We have jurisdiction. See Fla. R. App. P. 9.170(b)(18) (authorizing appeals from orders "determin[ing] a motion or petition to strike an objection to a claim against an estate"). Because the trial court erred in limiting Dylan's[1] Estate's wrongful death claim to the amount of Jasper's insurance coverage, we reverse.

## Background

The undisputed facts are tragic. Jasper piloted a private plane in which his seventeen-year-old son, Dylan, and Jasper's girlfriend, Hue Pham Singletary, were passengers. The plane crashed into the Gulf of Mexico, killing all three.

Sabrina Jerrels, Jasper's daughter, petitioned for the intestate administration of Jasper's estate. Dylan's Estate and Singletary's Estate each filed a Statement of Claim for wrongful death, asserting that Jasper's negligence caused the fatal crash.

Singletary's Estate objected to the claim filed by Dylan's Estate. Because Dylan was an unemancipated minor at the time of his death, Singletary's Estate argued that the "claim . . . [wa]s barred by the doctrine of parental immunity for any amounts beyond the limits of liability insurance" held by Jasper.

Singletary's Estate relied on Ard v. Ard, 414 So. 2d 1066, 1067 (Fla. 1982) ("While we reaffirm our adherence to parental/family immunity, we hold that, in a tort

---

[1]For ease of reference and to avoid confusion, we will use Dylan's and Jasper's first names throughout this opinion.

- 2 -

action for negligence arising from an accident and brought by an unemancipated minor child against a parent, the doctrine of parental immunity is waived to the extent of the parent's available liability insurance coverage. If the parent is without liability insurance, or if the policy contains an exclusion clause for household or family members, then parental immunity is not waived and the child cannot sue the parent."), and Joseph v. Quest, 414 So. 2d 1063, 1063 (Fla. 1982) (answering the certified question as to whether "an action for contribution lies against the parent of an injured child . . . by holding that contribution is available against a parent to the extent of existing liability insurance coverage for the parent's tort against the child").

The trial court agreed with Singletary's Estate based upon "[a] strict reading of Florida Statute § 768.19, [Fla. Stat. (2016)]" explaining that "[h]ad Dylan . . . survived there is no dispute" that Dylan's recovery would have been limited to Jasper's insurance policy limits. Thus, although the doctrine of parental immunity may "no longer exist . . . that [wrongful death] suit is still limited by . . . . Ard v. Ard and Joseph v. Quest." Consequently, the trial court sustained the objection.

Dylan's Estate counters before us that parental immunity is inapplicable. Dylan's Estate argues that because both parties to the immunity are deceased, the public policy purposes underlying parental immunity disappear. Dylan's Estate also asserts that, because of the deaths of Dylan and Jasper, the trial court erred in capping the estate's claims to the amount of available insurance.

## Analysis

This case offers a confounding confluence of competing legal issues. Because the primary basis for the trial court's decision turns on its reading of section 768.19, we turn first to the statute.

- 3 -

## I.        Florida Wrongful Death Act

Our "purpose in construing a statute is to give effect to legislative intent, which is the polestar that guides the court in statutory construction." Gomez v. Vill. of Pinecrest, 41 So. 3d 180, 185 (Fla. 2010); see also Diamond Aircraft Indus., Inc. v. Horowitch, 107 So. 3d 362, 367 (Fla. 2013) ("Legislative intent is the polestar that guides our analysis regarding the construction and application of the statute." (citing Bautista v. State, 863 So. 2d 1180, 1185 (Fla. 2003))).  Thus, we " 'begin with the actual language used in the statute' because legislative intent is determined first and foremost from the statute's text." Raymond James Fin. Servs., Inc. v. Phillips, 126 So. 3d 186, 190 (Fla. 2013) (quoting Heart of Adoptions, Inc. v. J.A., 963 So. 2d 189, 198 (Fla. 2007)).  After all, "[a]n action for wrongful death is a purely statutory right." Toombs v. Alamo Rent-A-Car, Inc., 833 So. 2d 109, 111 (Fla. 2002).

Section 768.19 defines the right of action for wrongful death as follows:

> When the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person, including those occurring on navigable waters, and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person or watercraft that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured . . . .

§ 768.19.[2]  The legislature has deemed it "the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer."  § 768.17.  Accordingly, a wrongful death "action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's

---

[2]Section 768.19 has remained unchanged since its enactment in 1972. See Ch. 72-35, § 1, Laws of Fla.

survivors and estate all damages, as specified in this act, caused by the injury resulting in death." § 768.20.

There is tension between section 768.19, which creates the wrongful death right of action, and sections 768.17 and 768.20, which establish the cause of action.[3] See Toombs, 833 So. 2d at 111 ("Section 768.19 . . . defines the right of action under the Wrongful Death Act . . . ."). As the trial court read section 768.19, parental immunity limited Dylan's Estate's potential recovery because section 768.19 conditions the right of action upon whether "the event would have entitled the person injured to maintain an action and recover damages if death had not ensued." See also Laizure v. Avante at Leesburg, Inc., 109 So 3d 752, 760 (Fla. 2013) ("The right of the survivors to recover is predicated in the Act on the decedent's right to recover. In other words, recovery is precluded if the decedent could not have maintained an action and recovered damages if death had not ensued."); Toombs, 833 So. 2d at 118 ("[T]he language of the [Wrongful Death] Act makes clear a cause of action for wrongful death that is predicated on the decedent's entitlement to 'maintain an action and recover damages if death had not ensued.' " (quoting § 768.19, Fla. Stat. (1995))). Although the "Wrongful Death Act creates independent claims for the survivors, these claims are also derivative in the sense that they are dependent upon a wrong committed upon another

---

[3]A right of action is a remedial right affording redress for the infringement of a legal right belonging to some definite person, whereas a cause of action is the operative facts which give rise to such right of action. When a legal right is infringed, there accrues, ipso facto, to the injured party a right to pursue the appropriate legal remedy against the wrongdoer. This remedial right is called a right of action.

Shiver v. Sessions, 80 So. 2d 905, 908 (Fla. 1955).

person. No Florida decision has allowed a survivor to recover under the wrongful death statute where the decedent could not have recovered." Valiant Ins. Co. v. Webster, 567 So. 2d 408, 411 (Fla. 1990), receded from on other grounds by Gov't Emps. Ins. Co. v. Douglas, 654 So. 2d 118, 119-20 (Fla. 1995).

Seemingly, therefore, the wrongful death statute forecloses a deceased child's estate from recovering in a wrongful death action against a deceased parent, despite the apparent legislative intent to the contrary. See § 768.17. Fla. Stat. (2016) ("It is the public policy of the state to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer."). The parental immunity doctrine resolves this apparent incongruity; that is, because we conclude that the doctrine carries no weight under the facts of this case, it does not serve to bar or limit Dylan's Estate's claim.

**II.       Parental Immunity**

Generally, "[p]arents are . . . immune from tort claims brought by their children." Claire's Boutiques v. Locastro, 85 So. 3d 1192, 1196 (Fla. 4th DCA 2012) (en banc) (citing Herzfeld v. Herzfeld, 781 So. 2d 1070, 1072 (Fla. 2001)). This court was the first in Florida to recognize this immunity. See Rickard v. Rickard, 203 So. 2d 7 (Fla. 2d DCA 1967); Meehan v. Meehan, 133 So. 2d 776 (Fla. 2d DCA 1961). We observed that:

> [t]his rule [parental immunity], like that forbidding at common law the bringing of an action by a wife against her husband for a personal tort, is not the product of any inherent disability of the child to sue its parent, but rather is based upon the interest that society has in preserving harmony in the domestic relations. It is said that the rule is not an absolute one, but exists only where the suit would disturb the family relations.

Rickard, 203 So. 2d at 8 (quoting 39 Am. Jur. Parent and Child § 90). Several years later, the supreme court, in Orefice v. Albert, 237 So. 2d 142, 145 (Fla. 1970), stated that "[i]t is established policy, evidenced by many decisions, that suits will not be allowed in this state among members of a family unit for tort. Spouses may not sue each other, nor children their parents. The purpose of this policy is to protect family harmony and resources." See also Claire's Boutiques, 85 So. 3d at 1196 ("Such immunity has been premised on public policies that favor harmonious familial relations and parental discretion over discipline while discouraging the depletion of family resources from frivolous suits, among others."). From its inception, "the concern with family integrity has remained at the core of the doctrine." Herzfeld, 781 So. 2d at 1073.

Spousal immunity, too, was largely predicated upon the same concerns. See Sturiano v. Brooks, 523 So. 2d 1126, 1128 (Fla. 1988) ("Actions between spouses must be barred when the policy reasons for maintaining the doctrine exist, such as the fear of disruption of the family or other marital discord, or the possibility of fraud or collusion."). The supreme court abrogated the spousal immunity doctrine in Waite v. Waite, 618 So. 2d 1360 (Fla. 1993). However, both doctrines are rooted in similar policy concerns, and parental immunity, as a common law creation, remains viable subject to several exceptions, none of which apply here. See, e.g., Herzfeld, 781 So. 2d at 1079 (finding "that the policies behind the parental immunity doctrine are insufficient to justify barring a minor from recovering for intentional sexual abuse perpetrated by a parent"). We are guided by Dressler v. Tubbs, 435 So. 2d 792, 794 (Fla. 1983), in which the supreme court rejected the use of spousal immunity as a shield against the deceased wife's estate's wrongful death claim against the estate of her deceased husband.

**III.          Dressler v. Tubbs**

In Dressler, 435 So. 2d at 795, the court characterized interfamily immunity as a "disability to sue" which is extinguished when the basis for the immunity disappears.  In a strikingly similar factual scenario to our case, Eugene and Carole Tubbs died in a private airplane crash; Mr. Tubbs was the pilot.  Id. at 792.  Carole's estate sued Eugene's estate.  Id.  Carole was survived by her children, two of whom were from a prior marriage.  Id.  Eugene's estate filed a successful motion to dismiss the wrongful death claim on the grounds of interspousal and interfamily tort immunity.  Id. at 792-93.  The supreme court affirmed the Fifth District's decision reversing the dismissal, explaining that spousal immunity had no application under these facts: "This action for wrongful death is not barred by the doctrine of interspousal immunity" because "[h]usband and wife are dead.  There is no suit between spouses, just as there is no longer any marital unit to preserve."  Id. at 792, 794.

Although the language in section 768.19 conditions the wrongful death right of action upon whether "the event would have entitled the person injured to maintain an action and recover damages if death had not ensued," this language did not dissuade the Dressler court from holding that spousal immunity was no bar to the wrongful death action.  Id. at 793-94.  Indeed, the disability to sue disappeared upon the Tubbses' deaths.  Most assuredly, we can say that the same disability to sue disappeared upon the deaths of Dylan and Jasper.

Dressler relied upon an earlier decision in Shiver v. Sessions, 80 So. 2d 905 (Fla. 1955).  Shiver also involved a wrongful death action; the suit was brought on behalf of minor children whose stepfather had murdered their mother and then committed suicide.  Id. at 905-06.  The trial court dismissed the complaint, reasoning

that the wrongful death statute barred recovery because "the plaintiffs' stepfather could not have been sued by their mother during her lifetime on account of his tortious act." Id. at 906. The supreme court disagreed:

> We think that the previous decisions of this court respecting the force and effect of the common-law rule of marital immunity in other situations, as well as our previous interpretations of our Wrongful Death Act, lead inevitably to the conclusion that the rule of marital immunity has no application in this case and will not bar the suit.
>
> Thus, it is settled law in this jurisdiction that the wife's disability to sue her husband for his tort is personal to her, and does not inhere in the tort itself. . . . It is also well settled that our Wrongful Death Act creates in the named beneficiaries "an entirely new cause of action, in an entirely new right, for the recovery of damages suffered by them, not the decedent, as a consequence of the wrongful invasion of their legal right by the tort-feasor." This right is "separate, distinct and independent" from that which might have been sued upon by the injured person, had he or she lived.

Id. at 907 (citations omitted). The court specifically noted that the policies underlying spousal immunity were of no consequence "in view of the fact that the reason for the rule of marital immunity automatically disappears from the picture simultaneously with the accrual of the right of action under the Wrongful Death Act." Id. at 908.

We followed suit in Stone v. Valley Forge Ins. Co., 436 So. 2d 1069 (Fla. 2d DCA 1983). In that case, the husband was the negligent driver in an automobile accident resulting in the death of him and his wife. Id. The wife's estate sued the husband's estate and Valley Forge for wrongful death. Id. at 1070. We reversed the trial court's order barring the wrongful death action "on the authority of . . . Dressler" which, we observed, stood for the proposition "that the doctrine of interspousal immunity has no application in a suit for wrongful death brought by the estate of a deceased wife against the estate of a deceased husband." Id.

- 9 -

**IV.        Our Case**

In our view, <u>Dressler</u> controls.  The only difference between <u>Dressler</u> and this case is the type of interfamily immunity involved.  Nevertheless, the policy reasons supporting spousal and parental immunity are indistinguishable.  <u>See</u> <u>Ard</u>, 414 So. 2d at 1067 ("Protecting the family unit is a significant public policy behind parental immunity.  We are greatly concerned by any intrusion that might adversely affect the family relationship.  Litigation between family members would be such an intrusion.").

Although Dylan may have had a disability to sue his father while he was alive, the policy rationale underlying the disability disappeared upon both their deaths, and thus the disability likewise evaporated.  Consequently, parental immunity cannot bar a wrongful death claim brought by Dylan's Estate.  <u>Cf.</u> <u>Claire's Boutiques</u>, 85 So. 3d at 1197 ("[P]ublic policy prohibits even a negligent parent from being compelled to contribute to his or her child's damages because of the strain it would place on the family relationship.").

Singletary's Estate relies heavily on the supreme court's decision in <u>Toombs</u>, 833 So. 2d at 109.  There, the court barred a wrongful death recovery where the claim was predicated upon the dangerous instrumentality doctrine; the decedent wife's estate had no right of action because, at the time of her death, she was a co-bailee of the vehicle.  <u>Id.</u> at 118.  The court held that "[a]bsent the ability to impute [the husband]'s negligence to Alamo, no right of action originated in the decedent to which a wrongful death cause of action could attach."  <u>Id.</u>

> Although we have long emphasized that an action for wrongful death is distinct from the decedent's action for personal injuries had he or she survived because it involves different rights of recovery and damages, the language of the Act makes clear a cause of action for wrongful death that

- 10 -

is predicated on the decedent's entitlement to "maintain an action and recover damages if death had not ensued." <u>See Valiant Ins. Co. v. Webster</u>, 567 So. 2d 408, 411 (Fla. 1990) ("While the Wrongful Death Act creates independent claims for the survivors, these claims are also derivative in the sense that they are dependent upon a wrong committed upon another person."); <u>Celotex Corp. v. Meehan</u>, 523 So. 2d 141, 147 (Fla. 1988) ("[A] wrongful death action is derivative of the injured person's right, while living, to recover for personal injury."). Accordingly, . . . we hold that no cause of action for wrongful death survived the decedent in the instant case because she had no right of action at her death.

<u>Toombs</u>, 833 So. 2d at 118.

Critical to the resolution of <u>Toombs</u> was the court's distinction of <u>Shiver</u> and <u>Dressler</u>. As the court noted, "[a]t the heart of the distinction drawn in <u>Shiver</u> was this Court's recognition that the policies engendered by interspousal immunity were of no moment in the action for wrongful death." <u>Toombs</u>, 833 So. 2d at 114 (quoting <u>Shiver</u>, 80 So. 2d at 907); <u>see also</u> <u>Shiver</u>, 80 So. 2d at 907 ("An immunity based upon the preservation of marital harmony can have no pertinence in this case, for here the marriage has been terminated, husband and wife are both dead, and the action is brought for the benefit of a third person."). In fact, as the <u>Toombs</u> court observed, "[s]imilar policy concerns are not implicated by a consideration of the decedent's co-bailee status." 833 So. 2d at 118.

Instead, as the <u>Toombs</u> court recognized, its prior decisions in <u>Shiver</u> and <u>Dressler</u> apply in cases such as this one where courts are "grappling with the role of . . . immunity in an action for wrongful death." <u>Toombs</u>, 833 So. 2d at 114. In doing so, the court affirmed <u>Dressler</u>'s and <u>Shiver</u>'s application in wrongful death cases when both parties to an immunity are dead. <u>Toombs</u> did not involve an immunity personal to the decedent; it involved a case where the decedent had no cause of action at her death.

- 11 -

Toombs did not overturn or recede from Dressler or Shiver. Unlike a co-bailee attempting to bring an action under the dangerous instrumentality doctrine, parental immunity does not inhere to the tort itself and, at the time of death, the child still possesses a cause of action against the parent.

**V.         Section 768.19 and Limits on Wrongful Death Recovery**

Finally, we address the trial court's determination that any recovery by Dylan's Estate's wrongful death claim was limited "to the extent of [Jasper]'s available liability insurance coverage." See Ard, 414 So. 2d at 1067. Again, we turn first to the language of section 768.19.

The statute contains no such explicit limit on damages. See § 768.19. Furthermore, Toombs analyzed section 768.19 and distinguished Dressler as pertaining to wrongful death cases where familial immunities were asserted. Consequently, as an initial matter of fact, we note that Ard and Joseph are distinguishable insofar as neither case concerned a wrongful death claim; in each, both the parent and child were still alive when the negligence suit was filed.

In Ard, a minor child was injured when his mother took him out of a car, placed him in dangerous position, and he was hit by a motor vehicle. 414 So. 2d at 1066. The minor child survived and filed suit against the mother for negligence. Id. The supreme court held that the son may file suit against the mother and may recover an award up to the amount of the available insurance. Id. Critically, the Ard court observed that invocation of the parental immunity doctrine would stymie the policy rationale underlying the immunity, rather than serve to promote its purposes. See id. at 1068-69 ("When recovery is allowed from an insurance policy the claimant will not force a depletion of the family assets at the expense of the other family members. . . .

- 12 -

[R]ather than a source of disharmony, the action is more likely to ease the financial difficulties stemming from the injuries."). Thus, the court explained, "[t]he effect of her immunity is to bar an otherwise valid action brought by her son against her." Id. at 1070.

Similarly, in Joseph, a case decided the same day as Ard, the parents and the child were also living. 414 So. 2d at 1064-65. In that case, a minor child was hit by a car driven by Marion Quest. Id. at 1063. The child survived the crash. Id. The child's father sued Ms. Quest for both himself and on behalf of his son. Id. Ms. Quest filed a third-party action against the child's mother alleging that the mother had negligently supervised her child, contributing to the child's injuries. Id. The jury attributed ten percent fault each to the child and his father, twenty-five percent fault to the child's mother, and the remaining liability to Ms. Quest. Id. at 1063-64. The jury awarded $150,000 for the child's damages and $17,000 in damages for the child's father. Id. Thereafter, the trial court reduced the awards to the child and his father by ten percent. Id.

On appeal, Ms. Quest argued that the trial court should have allowed for a setoff of the judgment against the child's mother. Id. "The district court framed the issue as whether a defendant has a right of contribution against the parent of an injured child." Id. Relying on Ard, the supreme court held "that contribution is available against a parent to the extent of existing liability insurance coverage for the parent's tort against the child." Joseph, 414 So. 2d at 1065. In so holding, the court reasoned that limiting the parental liability for contribution in this setting would ensure that there would be no chilling effect on parents filing suit on their minor children's behalf when there was the possibility that they could be liable for contribution. Id. at 1064.

- 13 -

Both Ard and Joseph concern scenarios in which both the tortfeasor parent(s) and child were still alive. Thus, allowing tort damages to the extent of insurance coverage would not sow the discord usually present in interfamily squabbles. This critical distinction makes our case similar to Shiver, Dressler, and Stone. As both Ard and Joseph recognized and reaffirmed, the policy rationale behind parental immunity in preserving familial harmony is not affected when there is insurance coverage. Similarly, Dressler explained that the policy rationale of preserving familial harmony and familial assets is not implicated at all when both the parent and child are deceased. Because in this case both Dylan and Jasper are deceased, the policy reasons behind the immunity dissolved and there was no need to cap damages as the trial court did.

More recently, the supreme court explained that the rationale behind "[a]brogation of the parental immunity doctrine in accident cases has been largely based on the prevalence of liability insurance." Herzfeld, 781 So. 2d at 1074. In such cases, "the domestic harmony policy concern is diminished . . . because the injured child's dispute is actually with the financially responsible insurance carrier rather than with the parents." Id. On the other side of the coin, in a case such as the one confronting us, where both the parent and child are deceased, this stated basis for capping damages is enfeebled by the absence of a need to maintain domestic harmony.

### Conclusion

The trial court erred in sustaining the objection to Dylan's Estate's wrongful death claim against Jasper's Estate. We reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.

SILBERMAN, J., Concurs.
ATKINSON, J., Dissents with opinion.


ATKINSON, Judge, Dissenting.

I respectfully dissent. Dylan's Estate is only entitled to damages that Dylan would have been entitled to recover had Dylan's death "not ensued." See 768.19, Fla. Stat. (2016) ("When the death of a person is caused by the . . . negligence . . . of any person . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person . . . that would have been liable in damages if death had not ensued shall be liable . . . notwithstanding the death of the person injured . . . ."); cf. Laizure, 109 So. 3d at 762 ("The estate and heirs stand in the shoes of the decedent for purposes of whether the defendant is liable . . . and it would be anomalous to give greater rights to the estate and heirs than to the decedent.").

Dylan's father, Jasper, also died, but his defenses survived him. It does not matter that both the tortfeasor and injured party are deceased, because the survivors' right of action is dependent on whether the tortfeasor "would have been liable in damages if death had not ensued." § 768.19. Neither Jasper nor his estate would be liable to Dylan if Dylan had not passed away, because such liability would have been foreclosed by the defense of parental immunity. Cf. Laizure, 109 So. 3d at 760

- 15 -

("[R]ecovery is precluded if the decedent could not have maintained an action and recovered damages if death had not ensued.").[4]

Had Dylan not died, he would not have been "entitled . . . to maintain an action and recover damages" against his father or his father's estate in excess of available liability insurance coverage. See § 768.19; Laizure, 109 So. 3d at 760 ("The right of the survivors to recover is predicated in the Act on the decedent's right to recover."). Because parental immunity survived the tragic accident that took the lives of Dylan and Jasper, the son's estate has no right of recovery against the father's estate beyond available liability insurance limits.

---

[4]But even assuming arguendo that it does matter that both parties to the immunity are dead, recovery would still be limited. There is some logic to the evaporation of the policy concern of matrimonial harmony when both spouses have died. See Dressler, 435 So. 2d at 792, 794 (finding a wrongful death action arising from a crash that killed a husband and wife was not barred by interspousal immunity because "there is no longer any marital unit to preserve"). However, the protection of familial harmony and resources underlying parental immunity does not cease to be a policy goal after only two members of a family are killed in the same accident.