997 So.2d 349 (2008)
Scott Corey KIRTON, etc., et al., Petitioners,
v.
Jordan FIELDS, etc., et al., Respondents.
Dean Dyess, Petitioner,
v.
Jordan Fields, etc., et al., Respondents.
H. Spencer Kirton, et al., Petitioners,
v.
Jordan Fields, etc., et al., Respondents.
Nos. SC07-1739, SC07-1741, SC07-1742.
Supreme Court of Florida.
December 11, 2008.
*350 William J. Wallace of William J. Wallace, P.A., Okeechobee, FL, Richard Lee Barrett and Ralph Steven Ruta, of Barrett, Chapman and Ruta, P.A., Orlando, FL, and Alan C. Espy of Alan C. Espy, P.A., Palm Beach Gardens, FL, for Petitioners.
Timothy J. Owens of Christensen, Christensen, Donchatz, Kettlewell, and Owens, LLP, Columbus, OH, on behalf of The American Motorcyclist Association, for Amicus Curiae.
Bard d. Rockenbach of Burlington and Rockenbach, P.A., West Palm Beach, and Laurence C. Huttman of Rubin and Rubin, Stuart, FL, for Respondents.
QUINCE, C.J.
We have for review the decision of the Fourth District Court of Appeal in Fields v. Kirton, 961 So.2d 1127 (Fla. 4th DCA 2007), which certified the following question to be of great public importance:
WHETHER A PARENT MAY BIND A MINOR'S ESTATE BY THE PRE-INJURY EXECUTION OF A RELEASE.
We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.[1] For the reasons discussed below, we answer the certified question in the negative and hold that a parent does not have the authority to execute a pre-injury release on behalf of a minor child when the release involves participation in a commercial activity.[2]

*351 STATEMENT OF THE CASE AND FACTS
The instant action arises from the decision by the Fourth District Court of Appeal in Fields v. Kirton, 961 So.2d 1127 (Fla. 4th DCA 2007). The facts of the underlying action were detailed in the opinion of that court:
Pursuant to a final judgment of dissolution of marriage, Bobby Jones was the primary residential parent for his fourteen year old son, Christopher. On May 10, 2003, the father took Christopher to Thunder Cross Motor Sports Park to ride his all terrain vehicle (ATV). To gain entry to the facility and be allowed to participate in riding the ATV, Bobby Jones, as Christopher's natural guardian, signed a release and waiver of liability, assumption of risk, and indemnity agreement. While attempting a particular jump, Christopher lost control of his ATV, causing himself to be ejected. Tragically, he hit the ground with the ATV landing on top of him. He got up, walked a short distance, then collapsed and died. Christopher's mother, Bette Jones, was unaware that the father was permitting their son to engage in this activity. She was also unaware that approximately one month prior to the accident causing Christopher's death, he had attempted the same jump, resulting in a fractured rib and mild concussion.
Id. at 1128.
Subsequently, Fields, as personal representative of the estate of Christopher Jones, filed suit for wrongful death against Spencer Kirton, Scott Corey Kirton, Dudley Kirton, and the Kirton Brother Lawn Service, Inc. ("the Kirtons") as owners and operators of Thunder Cross Motor Sports. The amended complaint also named Dean Dyess as a defendant for his participation in the management of the park. The Kirtons then filed an answer and affirmative defenses to the amended complaint. In one of the affirmative defenses, the Kirtons argued that the claims raised by Fields were barred by the release and waiver executed by Mr. Jones on behalf of his son. The Kirtons thereafter filed a motion for summary judgment based on the release and waiver.[3] The trial court entered an order granting the Kirtons' motion for summary judgment on the wrongful death claim, finding that there was no genuine issue of material fact because the release executed by Mr. Jones on behalf of his minor child, Christopher, barred the claim.
On appeal, the Fourth District reversed the trial court's order granting the motion for summary judgment. In doing so, the district court emphasized that the issue was not about a parent's decision on what activities are appropriate for his or her minor child, which is properly left to the parent. Instead, the issue concerned the "decision to absolve the provider of an activity from liability for any form of negligence... [which] goes beyond the scope of determining which activity a person feels is appropriate for their child." Id. at 1129. This is because the "effect of the parent's decision in signing a pre-injury *352 release impacts the minor's estate and the property rights personal to the minor." As a result, the district court found that these rights could not be waived by the parents absent a basis in common law or statute. Id. at 1129-30. The district court found that there was no statutory scheme governing the issue of pre-injury releases signed by parents on behalf of minor children. Because there is no basis in common law or statute, the district court found that the courts do not have the authority to "judicially legislate that which necessarily must originate, if it is to be law, with the legislature." Id. at 1130. Accordingly, the district court held that a parent could not bind a minor's estate by the parent's execution of a pre-injury release. In doing so, the Fourth District also certified the above question to be of great public importance and certified conflict with the Fifth District Court of Appeal's decision in Lantz v. Iron Horse Saloon, Inc., 717 So.2d 590 (Fla. 5th DCA 1998).

ANALYSIS
The issue in this case is the enforceability of a pre-injury release executed by a parent on behalf of a minor child that binds a minor child's estate and releases an activity provider from liability. Because the enforceability of the pre-injury release is a question of law arising from undisputed facts, the standard of review is de novo. See D'Angelo v. Fitzmaurice, 863 So.2d 311, 314 (Fla.2003) (stating that the standard of review for pure questions of law is de novo and no deference is given to the judgment of the lower courts).
The Kirtons and the amicus curiae[4] supporting their position assert that a parent has a fundamental right to make decisions relating to the care of a minor child, and that right includes executing a pre-injury release on behalf of the minor child. The Kirtons also argue that enforcing the validity of a pre-injury release is consistent with Florida courts that have ruled that a parent has the prelitigation right to forego settlement awards in favor of pursuing a lawsuit without court approval or appointment of a guardian ad litem. On the other hand, Fields contends that pre-injury releases are invalid because neither the common law nor the Legislature has given parents the authority to waive these substantive rights of a minor child.

Parental Authority and the State's "Parens Patriae" Authority
The enforceability of a pre-injury release concerns two compelling interests: that of the parents in raising their children and that of the state to protect children. Parental authority over decisions involving their minor children derives from the liberty interest contained in the Fourteenth Amendment to the United States Constitution and the guarantee of privacy in article I, section 23 of the Florida Constitution. See Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion) ("In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); see also Beagle v. Beagle, 678 So.2d 1271, 1275 (Fla.1996) ("The fundamental liberty interest in parenting is protected by both the Florida and federal constitutions. In Florida, it is specifically protected by our privacy provision."). In fact, beginning with Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the United States Supreme Court has recognized that parents have a constitutionally protected interest in child rearing. In Troxel, the *353 United States Supreme Court further pointed to a presumption that
fit parents act in the best interests of their children.... Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.
530 U.S. at 68-69, 120 S.Ct. 2054; see also Von Eiff v. Azicri, 720 So.2d 510, 514 (Fla.1998) ("Neither the legislature nor the courts may properly intervene in parental decision-making absent significant harm to the child threatened by or resulting from those decisions.").
However, these parental rights are not absolute and the state as parens patriae may, in certain situations, usurp parental control. In Global Travel Marketing, Inc. v. Shea, 908 So.2d 392, 399 (Fla.2005), we explained the concept of parens patriae as applied in this State:
"Parens patriae," which is Latin for "parent of his or her country," describes "the state in its capacity as provider of protection to those unable to care for themselves." Black's Law Dictionary 1144 (8th ed.2004). The doctrine derives from the common-law concept of royal prerogative, recognized by American courts in the form of legislative prerogative. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 600, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). The United States Supreme Court, upholding a state child labor law in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), recognized the parens patriae power when it stated that although the "custody, care, and nurture of the child reside first in the parents, ... the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways." Id. at 166, 64 S.Ct. 438 (footnotes omitted).
In decisions over the past three decades, this Court has expressly relied on the state's parens patriae authority to protect children in two areas: (1) juvenile delinquency and dependency, see P.W.G. v. State, 702 So.2d 488, 491 (Fla. 1997); State v. D.H., 340 So.2d 1163, 1166 (Fla.1976); In re Camm, 294 So.2d 318, 320 (Fla.1974); and (2) child custody and support. See Schutz v. Schutz, 581 So.2d 1290, 1293 (Fla.1991); Lamm v. Chapman, 413 So.2d 749, 753 (Fla. 1982); Kern v. Kern, 333 So.2d 17, 19 (Fla.1976). Pervasive statutory schemes cover each of these areas. See generally ch. 39, Fla. Stat. (2004) ("Proceedings Relating to Children"); ch. 61, Fla. Stat. (2004) ("Dissolution of Marriage; Support; Custody"); ch. 984, Fla. Stat. (2004) ("Children and Families in Need of Services"); ch. 985, Fla. Stat. (2004) ("Delinquency; Interstate Compact on Juveniles").
Although there is no statutory scheme governing pre-injury releases, the Kirtons argue that a parent's execution of a pre-injury release falls squarely within the parent's authority to settle pursuant to section 744.301(2), Florida Statutes (2007). This statutory provision allows a parent, acting as the natural guardian of a minor child, to settle the child's claim for amounts up to $15,000. The Kirtons reason that because at the time a parent signs a pre-injury release, the claim is worth less than $15,000, the parent's authority to execute a pre-injury release for a minor child falls within this section. Contrary to the Kirtons' assertion, a parent's authority to execute a pre-injury release on behalf of a minor child does not fall within the purview *354 of section 744.301(2). Section 744.301, Florida Statutes (2007), applies to situations where a minor child already has a cause of action against another party. A pre-injury release is executed before any cause of action accrues and extinguishes any possible cause of action.
The absence of a statute governing parental pre-injury releases demonstrates that the Legislature has not precluded the enforcement of such releases on behalf of a minor child. See Global Travel Mktg., Inc. v. Shea, 908 So.2d 392, 400 (Fla.2005) (noting that the absence of a statutory scheme governing a parent's agreement to binding arbitration on behalf of a minor child demonstrates that the Legislature has not precluded the enforcement of such agreements). However, we find that public policy concerns cannot allow parents to execute pre-injury releases on behalf of minor children.

Florida Courts
Although this is an issue of first impression for this Court, the district courts of Florida have addressed this matter, but their decisions have not been consistent. In Lantz v. Iron Horse Saloon, Inc., 717 So.2d 590 (Fla. 5th DCA 1998), the minor child's natural guardian filed suit against Iron Horse Saloon after the child was injured while operating a "pocket bike" on the Iron Horse premises. Id. at 591. The trial court granted Iron Horse's motion to dismiss the complaint based on the pre-injury release executed by the minor child's guardian. On appeal, the Fifth District affirmed the trial court's order granting the motion, finding that the release was sufficient to bar the child's claim. Id. at 591-92. However, the Fifth District's decision was based on the finding that the release clearly and unequivocally relieved Iron Horse from liability. The district court did not focus on whether the guardian had authority to execute the pre-injury release on behalf of the minor. Id.
In Gonzalez v. City of Coral Gables, 871 So.2d 1067 (Fla. 3d DCA 2004), the mother signed a pre-injury release so that the minor child could participate in the Coral Gables Fire Rescue Explorer Program. After the child was injured, the mother filed suit and the trial court entered summary judgment in favor of the city based on the release the mother had signed. The Third District affirmed and found that the release barred the mother's claim on behalf of the minor child. Id. at 1067-68. The district court relied on a distinction the Fourth District made in Shea v. Global Travel Marketing, Inc., 870 So.2d 20, 24 (Fla. 4th DCA 2003), quashed, 908 So.2d 392 (Fla.2005), between community and school-supported activities and commercial activities. The Third District found that because the explorer program was a community-supported activity, the release was enforceable. Gonzalez, 871 So.2d at 1067.[5] The Third District similarly found a parent's execution of a pre-injury release on behalf of a minor child, for participation on the high school cheerleading squad, enforceable. See Krathen v. School Bd. of Monroe Cty., 972 So.2d 887 (Fla. 3d DCA 2007). In Krathen, the Third District again discussed the Fourth District's distinction in Shea between school-supported activities and commercial activities. Id. at 889. However, the Third District's decision ultimately relied on this Court's finding in Shea that "parents have the authority to make the decision whether to waive a child's litigation rights in exchange for participation in an activity the parent feels is beneficial for the child." Id. at 889 (citing *355 Global Travel Mktg., Inc. v. Shea, 908 So.2d 392, 404 (Fla.2005)).
On the other hand, in Applegate v. Cable Water Ski, L.C., 974 So.2d 1112 (Fla. 5th DCA 2008), a case decided after Lantz, the Fifth District aligned itself with the Fourth District in the instant case and held that pre-injury releases are unenforceable as against public policy. Applegate involved a minor child who was injured while wakeboarding at a camp. In finding the parent's execution of the pre-injury release unenforceable, the district court emphasized that its decision was limited to commercial enterprises because "[t]hey can insure against the risk of loss and include these costs in the price of participation." Id. at 1115.
In Global Travel Marketing, Inc. v. Shea, the father brought a wrongful death action against a safari operator for the death of his son who was mauled by hyenas while on the safari. 908 So.2d at 395. Before the safari, the child's mother signed a travel contract on behalf of herself and her son, which included a release of liability and an arbitration agreement provision. Based on the travel contract, Global Travel moved to stay the proceedings and compel arbitration of the father's claim, which the trial court granted. Id. On appeal, the Fourth District reversed and found the arbitration clause unenforceable as to the child based on public policy grounds. Id. at 396. However, this Court quashed the Fourth District's decision and found the arbitration agreement enforceable against the minor or minor's estate in a tort action arising from the contract.[6] In doing so, this Court reasoned that if the courts required parents to seek court approval before entering into travel contracts that included arbitration agreements, courts would be second guessing a fit parent's decision. Id. at 404. The Court emphasized that parents who decide which activities their children can participate in may also decide on behalf of their children "to arbitrate a resulting tort claim if the risks of these activities are realized." Id.
A federal district court in Florida in two separate cases also found that pre-injury releases signed by parents on behalf of their minor children were invalid. See In re Royal Carribean Cruises Ltd., 459 F.Supp.2d 1275 (S.D.Fla.2006); In re Royal Caribbean Cruises, Ltd., 403 F.Supp.2d 1168 (S.D.Fla.2005) (where both the father and minor child were injured on a jet ski that was owned by Royal Caribbean on the island of Coco Cay, Bahamas). In both cases, the federal district court reviewed out-of-state precedent and found that in cases involving school-sponsored or community-run activities the courts upheld pre-injury releases, and in cases involving commercial activities the courts have found the releases unenforceable. In re Carribean Cruises Ltd., 459 F.Supp.2d at 1280; In re Royal Caribbean Cruises, Ltd., 403 F.Supp.2d at 1172.

Out-of-State Precedent
Other states and federal courts have also addressed the propriety of a parent or *356 guardian's execution of a pre-injury release on behalf of a minor child. In holding that pre-injury releases executed by parents on behalf of minor children are unenforceable for participation in commercial activities, we are in agreement with the majority of other jurisdictions. See, e.g., Johnson v. New River Scenic Whitewater Tours, Inc., 313 F.Supp.2d 621 (S.D.W.Va.2004) (finding a parent could not waive liability on behalf of a minor child and also could not indemnify a third party against the parent's minor child for liability for conduct that violated a safety statute such as the Whitewater Responsibility Act); Meyer v. Naperville Manner, Inc., 262 Ill.App.3d 141, 199 Ill.Dec. 572, 634 N.E.2d 411 (1994) (finding a parental pre-injury waiver unenforceable in a situation where the minor child was injured after falling off a horse at a horseback riding school); Doyle v. Bowdoin Coll., 403 A.2d 1206, 1208 n. 3 (Me.1979) (stating in dicta that a parent cannot release a child's cause of action); Smith v. YMCA of Benton Harbor/St. Joseph, 216 Mich.App. 552, 550 N.W.2d 262, 263 (1996) ("It is well settled in Michigan that, as a general rule, a parent has no authority, merely by virtue of being a parent, to waive, release, or compromise claims by or against the parent's child."); Hojnowski v. Vans Skate Park, 187 N.J. 323, 901 A.2d 381, 383 (2006) (finding that where a child was injured while skateboarding at a skate park facility, "a parent may not bind a minor child to a pre-injury release of a minor's prospective tort claims resulting from the minor's use of a commercial recreational facility"); Childress v. Madison County, 777 S.W.2d 1 (Tenn.Ct.App.1989) (extending the law that a parent could not execute a pre-injury release on behalf of a minor child to a mentally handicapped twenty-year-old student who was injured while training for the Special Olympics at a YMCA swimming pool); Munoz v. II Jaz, Inc., 863 S.W.2d 207 (Tex.App.1993) (finding that giving parents the power to waive a child's cause of action for personal injuries is against public policy to protect the interests of children); Hawkins v. Peart, 37 P.3d 1062, 1066 (Utah 2001) (concluding that "a parent does not have the authority to release a child's claims before an injury," where the child was injured as a result of falling off a horse provided by a commercial business); Hiett v. Lake Barcroft Cmty. Ass'n., 244 Va. 191, 418 S.E.2d 894 (1992) (concluding that public policy prohibits the use of pre-injury waivers of liability for personal injury due to future acts of negligence, whether for minor children or adults); Scott v. Pac. W. Mountain Resort, 119 Wash.2d 484, 834 P.2d 6 (1992) (holding that the enforcement of an exculpatory agreement signed by a parent on behalf of a minor child participating in a ski school is contrary to public policy).
Although there are jurisdictions where pre-injury releases executed by parents on behalf of minor children have been found enforceable, we note that the only published decisions where they have been upheld involved a minor's participation in school-run or community-sponsored activities. See, e.g., Hohe v. San Diego Unified Sch. Dist., 224 Cal.App.3d 1559, 274 Cal.Rptr. 647 (1990) (finding the pre-injury release executed by the father on behalf of the minor child enforceable against any claims resulting from the child's participation in a school-sponsored event); Sharon v. City of Newton, 437 Mass. 99, 769 N.E.2d 738 (2002) (holding that a parent has the authority to bind a minor child to a waiver of liability as a condition of a child's participation in public school extracurricular sports activities); Zivich v. Mentor Soccer Club, Inc., 82 Ohio St.3d 367, 696 N.E.2d 201, 205 (1998) (concluding that a parent may bind a minor child to a release of volunteers and sponsors of a nonprofit *357 sports activity from liability for negligence because the threat of liability would strongly deter "many individuals from volunteering for nonprofit organizations" because of the potential for substantial damage awards).
While this particular case involves a commercial activity, we note that these jurisdictions that have upheld pre-injury releases have done so because community-run and school-sponsored type activities involve different policy considerations than those associated with commercial activities. As the Ohio Supreme Court explained in Zivich, in community and volunteer-run activities, the providers cannot afford to carry liability insurance because "volunteers offer their services without receiving any financial return." 696 N.E.2d at 205. If pre-injury releases were invalidated, these volunteers would be faced with the threat of lawsuits and the potential for substantial damage awards, which could lead volunteers to decide that the risk is not worth the effort.

This Case
The trial court in this case specifically relied on the case law that has upheld the enforceability of the pre-injury release executed by the father on behalf of the deceased minor child in granting a motion for summary judgment in favor of the Kirtons. In reversing the trial court's order, the Fourth District first acknowledged that as part of the liberty interest contained in the Fourteenth Amendment to the United States Constitution and the guarantee of privacy in article I, section 23 of the Florida Constitution, parents have a right to determine what activities may be appropriate for the minor child's participation. However, the district court determined that the "decision to absolve the provider of an activity from liability for any form of negligence (regardless of the inherent risk or danger in the activity) goes beyond the scope of determining which activity a person feels is appropriate for their child." Fields, 961 So.2d at 1129. We agree.
Although parents undoubtedly have a fundamental right to make decisions concerning the care, custody, upbringing, and control of their children, Troxel, 530 U.S. at 67, 120 S.Ct. 2054, the question of whether a parent should be allowed to waive a minor child's future tort claims implicates wider public policy concerns. See Hojnowski, 901 A.2d at 390. While a parent's decision to allow a minor child to participate in a particular activity is part of the parent's fundamental right to raise a child, this does not equate with a conclusion that a parent has a fundamental right to execute a pre-injury release of a tortfeasor on behalf of a minor child. It cannot be presumed that a parent who has decided to voluntarily risk a minor child's physical well-being is acting in the child's best interest. Furthermore, we find that there is injustice when a parent agrees to waive the tort claims of a minor child and deprive the child of the right to legal relief when the child is injured as a result of another party's negligence. When a parent executes such a release and a child is injured, the provider of the activity escapes liability while the parent is left to deal with the financial burden of an injured child. If the parent cannot afford to bear that burden, the parties who suffer are the child, other family members, and the people of the State who will be called on to bear that financial burden. Therefore, when a parent decides to execute a pre-injury release on behalf of a minor child, the parent is not protecting the welfare of the child, but is instead protecting the interests of the activity provider. Moreover, a "parent's decision in signing a pre-injury release impacts the minor's estate and the property rights personal to the minor." Fields, 961 So.2d at 1129-30. *358 For this reason, the state must assert its role under parens patriae to protect the interests of the minor children.
Business owners owe their patrons a duty of reasonable care and to maintain a safe environment for the activity they provide. See Hojnowski, 901 A.2d at 388. If pre-injury releases were permitted for commercial establishments, the incentive to take reasonable precautions to protect the safety of minor children would be removed. Id. Moreover, as a provider of the activity, a commercial business can take precautions to ensure the child's safety and insure itself when a minor child is injured while participating in the activity. On the other hand, a minor child cannot insure himself or herself against the risks involved in participating in that activity. As the New Jersey Supreme Court stated in Hojnowski:
The operator of a commercial recreational enterprise can inspect the premises for unsafe conditions, train his or her employees with regard to the facility's proper operation, and regulate the types of activities permitted to occur. Such an operator also can obtain insurance and spread the costs of insurance among its customers. Children, on the other hand, are not in a position to discover hazardous conditions or insure against risks. Moreover, the expectation that a commercial facility will be reasonably safe to do that which is within the scope of the invitation, is especially important where the facility's patrons are minor children. If we were to permit waivers of liability, we would remove a significant incentive for operators of commercial enterprises that attract children to take reasonable precautions to protect their safety.
Id. (citations omitted).
Based on these public policy concerns, it is clear that the pre-injury release executed by Bobby Jones on behalf of his now deceased son was unenforceable because it prevented the minor's estate from bringing a cause of action against the commercial establishment that provided the activity which resulted in the minor's death.

CONCLUSION
For the reasons set forth above, we hold that a pre-injury release executed by a parent on behalf of a minor child is unenforceable against the minor or the minor's estate in a tort action arising from injuries resulting from participation in a commercial activity. Accordingly, we answer the certified question in the negative, approve the decision of the Fourth District, disapprove the Fifth District's decision in Lantz, and remand for proceedings consistent with this opinion.
It is so ordered.
ANSTEAD, PARIENTE, and LEWIS, JJ., concur.
ANSTEAD, J., specially concurs with an opinion.
PARIENTE, J., concurs with an opinion.
WELLS, J., dissents with an opinion.
CANADY and POLSTON, JJ., did not participate.
ANSTEAD, J., specially concurring.
I concur in the majority opinion and write separately to emphasize that our holding is narrowly directed at those commercial operators who wrongfully and negligently cause injury to a child but seek to be relieved of liability for their misconduct by securing a pre-activity release from the child's parent. Of course, under today's holding commercial operators who properly conduct their operations and cannot be demonstrated to have acted negligently *359 will continue to be free of liability. On the other hand, Florida's children and parents need not worry, after today's decision, that careless commercial operators may be immunized from their carelessness by the presence of an exculpatory clause in a ticket for admission.
Finally, I also find the articulation of the policy considerations supporting today's decision set out in Judge Torpy's opinion for the Fifth District in Applegate to be particularly instructive and persuasive:
Exculpatory contracts are, by public policy, disfavored in the law because they relieve one party of the obligation to use due care and shift the risk of injury to the party who is probably least equipped to take the necessary precautions to avoid injury and bear the risk of loss. Cain v. Banka, 932 So.2d 575, 578 (Fla. 5th DCA 2006). Nevertheless, because of a countervailing policy that favors the enforcement of contracts, as a general proposition, unambiguous exculpatory contracts are enforceable unless they contravene public policy. Id.; Ivey Plants, Inc. v. FMC Corp., 282 So.2d 205, 208 (Fla. 4th DCA 1973); Restatement (Second) of Torts § 496B.
Appellants concede that the contract at issue here is unambiguous but urge that the general rule should give way to an overriding public policy of protecting children from damages caused by negligently imposed injuries. This argument finds considerable support in the decisional law across the country. We are persuaded by some of the reasoning advanced by these authorities and also offer our own rationale for our holding.
Indisputably, Florida's public policy manifests a strong intent to protect children from harm. As parens patriae, the state's authority is broader than that of a parent's and may be invoked to limit parental authority when necessary to protect children. Global Travel Mktg., Inc. v. Shea, 908 So.2d 392, 399 (Fla. 2005). The expression of that policy most relevant here is the legislative limitation on parental authority to settle post-injury claims contained in section 744.301(2), Florida Statutes (2007). By requiring judicial approval of settlements over $15,000, the legislature has manifested a policy of protecting children from parental imprudence in the compromise of their claims for injury. Because parents' legal duty to support their children ends at or near the age of majority, the potential societal burden of an imprudent settlement justifies judicial oversight of the settlement contract.
The case of a pre-injury exculpatory clause may be distinguished from a post-injury settlement in one respect. In a pre-injury situation, there is no risk that financial pressure will induce parental imprudence. Instead, the parents' motivation is the potential benefit to the child derived from the child's participation in the activity. Theoretically, the prudent parent can weigh this benefit against the potential consequence of a negligently caused injury and determine whether it is in the child's best interest to execute an exculpatory clause and permit the activity. Motivations aside, however, the consequence of an imprudent decision is the same as in the post-injury context: a child will suffer injury for which society might ultimately bear the burden. Thus, the parents' interest is not necessarily consonant with those of society and the child.
Although this potential societal cost is arguably a justification to invalidate all pre-injury exculpatory clauses, we discern significant reasons for a distinction when a child is the subject. A consenting adult has the ability to avoid potential injury by exercising personal caution *360 and mitigate the impact of future economic loss by purchasing disability and health insurance policies. Conversely, children tend to throw caution to the wind during risky activities, resulting in a decreased chance of avoiding injury caused by the negligence of others. More importantly, children have no ability to indemnify themselves for future economic losses like their adult counterparts, making them especially vulnerable after the parents' support obligation ends. As parens patriae, the state also has an interest in protecting children from the non-economic consequences of negligently-caused injury. A policy that enforces exculpatory clauses fosters an increased risk of injury through carelessness. For these reasons, although the scales of public policy might tip in favor of the enforcement of exculpatory contracts involving consenting adults, we think they tip the other way when children are the subject.
We emphasize that our holding is limited to commercial enterprises. They can insure against the risk of loss and include these costs in the price of participation.
Applegate, 974 So.2d at 1114-15 (footnote and citation omitted).
PARIENTE, J., concurring.
I fully concur with the majority's conclusion that the pre-injury release signed by the father on behalf of his fourteen-year-old son, executed in order to "gain entry to the facility and be allowed to participate in riding the ATV in the Thunder Cross Motor Sports Park," is invalid. The owners and operators of the sports park, the Kirtons, raised the execution of this release as a complete defense to the wrongful death action brought on behalf of the estate.
I write to emphasize several points. First, as pointed out by the Fourth District, "[t]here is no basis in common law for a parent to enter into a compromise or settlement of a child's claim, or to waive substantive rights of the child without court approval." Fields, 961 So.2d at 1130.
Second, the release in this case was all-encompassing, as it covered not just injuries occurring as a result of the activity of ATV riding, which itself could be considered inherently dangerous, but all negligent acts. The allegations of the complaint in this case, which we must accept as true, asserted in pertinent part that the ATV fourteen-year-old Christopher Jones was "racing and jumping" on "the course set up and maintained by Defendants" was recommended "only for use by those over the age of 16" by the manufacturer. Significantly, the allegations also asserted that "the subject four wheel all terrain vehicle was not designed by the manufacturer or recommended for racing or jumping on a course such as the course constructed and maintained by Defendants and/or Defendants' agents and employees."
Moreover, the amended complaint alleged that the Kirtons had prior knowledge of Christopher Jones's limited experience based on a serious injury he sustained on the same course with the same ATV approximately one month before:
Defendants and/or their agents and employees knew or should have known that a fourteen year old with limited experience as a rider, such as CHRISTOPHER JONES, should not have been permitted to operate the subject 350 cc four wheel all terrain vehicle in the manner it was being operated by him on the course constructed and maintained by THUNDER CROSS MOTOR SPORTS PARK on May 10, 2003. This is particularly the case given the fact that the last time CHRISTOPHER JONES operated the subject 350 cc four wheel all terrain *361 vehicle he operated it in the same manner and "missed the jump" while riding on the identical course constructed and maintained by THUNDER CROSS MOTOR SPORTS PARK on April 6, 2003. On that date he was seriously injured such that he was removed from the Defendant's property by Fire Rescue personnel and was transported to the hospital for treatment.
The amended complaint further alleged that the negligent design of the course and the failure to have a "flag man" to alert riders to the dangers of the course and to prevent the fatal injuries directly caused or substantially contributed to the death of Christopher Jones. As explained in the amended complaint:
On May 10, 2003 while attempting to jump on Defendants' course which was negligently constructed and/or maintained by Defendants through their agents and their employees, CHRISTOPHER JONES "missed the jump" so that he came up short and did not clear the jump. The front tires of the four wheel all terrain vehicle he was operating hit the ground first and CHRISTOPHER JONES bounced over the handlebars, flipped off the four-wheeler to the right and the four-wheeler went to the left and then came back directly at him.
Although there was supposed to be a flag man stationed at the jump to alert riders of dangers on the course and to assist in rendering assistance to injured riders such as CHRISTOPHER JONES, there was no flag man stationed at the jump that CHRISTOPHER JONES was attempting to navigate when the accident occurred on May 10, 2003. Because the four-wheeler came back at CHRISTOPHER JONES after he was thrown off the vehicle, had a flag man been close enough to the jump, he would have been able to remove CHRISTOPHER JONES from harm's way before the vehicle hit and killed him.
In distinguishing between risks inherent in the activity and separate acts of negligence, the Fourth District explained:
The decision to absolve the provider of an activity from liability for any form of negligence (regardless of the inherent risk or danger in the activity) goes beyond the scope of determining which activity a person feels is appropriate for their child. The decision to allow a minor to participate in an activity is properly left to the parents or natural guardian. For instance, the decision to allow one's child to engage in scuba diving or sky diving involves the acceptance of certain risks inherent in the activity. This does not contemplate that a dive instructor will permit or encourage diving at depths beyond safe recreational limits, or that the pilot of the plane on a sky diving venture is intoxicated or otherwise impaired, both situations which could cause injury to the minor.
Id. at 1129. I agree with this distinction. Although the father accepted the risks inherent in ATV riding by allowing his son to participate in the activity, his acceptance did not contemplate that the defendants would act negligently as described in the amended complaint.
Finally, I write to emphasize that this Court limits its decision to activities provided by commercial establishments because those were the facts presented by this case. However, I do not agree with the reasoning of those cases cited by the majority that have found that all releases from liability for noncommercial activities are automatically valid. To me there is an important distinction between a release to allow a child to participate in school activities, such as cheerleading or football, *362 which could be considered inherently dangerous, and a blanket release that absolves the sponsor of liability from all negligent acts. As with commercial activities, when a parent allows his or her child to participate in an inherently dangerous noncommercial activity, his or her acceptance does not contemplate that the activity provider will act negligently.
WELLS, J., dissenting.
While I agree that it would be a good policy to limit parental pre-injury releases of minors' claims for injuries or death arising out of dangerous activities operated by commercial entities, until today this Court has never held that such a pre-injury release knowingly executed by a parent is unenforceable. Nor until this case was decided by the Fourth District Court of Appeal, had a district court of appeal held such a pre-injury release unenforceable. Furthermore, when the parent in this case signed such a release, the Legislature had not prohibited or regulated pre-injury parental releases of a minor's claims, though the Legislature had legislated as to post-injury parental releases of a minor's claims. See §§ 744.301, 744.387, Fla. Stat. (2003). The Legislature has not subsequently acted to regulate pre-injury releases. Thus, at the time of this parental agreement which permitted the minor to participate in this activity, there was no law in Florida, either statutory or court-declared, enunciating the public policy that the majority now determines makes this agreement unenforceable. Absent the majority's decision that such an agreement is against public policy, the agreement would without question be enforceable. See Ivey Plants, Inc. v. FMC Corp., 282 So.2d 205, 208 (Fla. 4th DCA 1973) (explaining that exculpatory clauses are generally valid and enforceable absent public policy requiring nonenforcement). I believe that it is fundamentally unfair to now declare a new public policy and then apply it to the defendants in this case.
Moreover, I conclude that the majority opinion highlights why the decision as to the enforceability of a parent's pre-injury release of a minor's claim is and should be a legislative decision. The majority opinion creates many questions and provides few answers. The answers will have to be gleaned from further costly case-by-case litigation, and if the particular circumstances of other releases are found to be against the declared public policy, the result will be additional after-the-fact determinations of liability without sufficient notice to the parties involved.
The majority opinion draws a distinction between "commercial establishments" and "community based or school activities," which is precisely the distinction that this Court's majority criticized in quashing the Fourth District Court of Appeal's decision in Global Travel Marketing, Inc. v. Shea, 908 So.2d 392 (Fla.2005). The Court expressly stated:
[T]he line dividing commonplace activities from commercial travel opportunities is far from clear, given that some commonplace school or community activities might also involve commercial travel. The Fourth District decision might prevent arbitration of claims of minors arising from their parents' decisions in individually authorizing activities that involve commercial travel, but not from the decisions of school authorities in arranging for the same activity.
We see no basis in fact or law for this distinction, nor a reliable standard by which to apply it without making value judgments as to the underlying activity that the parent has deemed appropriate for the child to engage in. Moreover, the alternative of requiring parents to seek court approval before entering into *363 commercial travel contracts that include arbitration agreements would place courts in a position of second guessing the decision-making of a fit parent.
Id. at 404 (footnote omitted). In reaching our decision, we relied upon and quoted from Troxel v. Granville, 530 U.S. 57, 68-69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").
I recognize that in Shea the majority said in a footnote that it was not addressing the distinction between commercial and community-based and school-related activities as applied to pre-injury waivers of liability. See 908 So.2d at 395 n. 3. However, in this case, the majority does not have any more of a reasonable "basis in law or fact for this distinction, nor a reliable standard by which to apply it without making value judgments as to the underlying activity that the parent has deemed appropriate for the child to engage in" than the majority had in Shea. As found in Shea, the line dividing commercial activities from community-based and school-related activities is far from clear. For example, is a Boy Scout or Girl Scout, YMCA, or church camp a commercial establishment or a community-based activity? Is a band trip to participate in the Macy's Thanksgiving Day parade a school or commercial activity? What definition of commercial is to be applied?
The importance of this issue cannot be overstated because it affects so many youth activities and involves so much monetary exposure. Bands, cheerleading squads, sports teams, church choirs, and other groups that often charge for their activities and performances will not know whether they are a commercial activity because of the fees and ticket sales. How can these groups carry on their activities that are so needed by youth if the groups face exposure to large damage claims either by paying defense costs or damages? Insuring against such claims is not a realistic answer for many activity providers because insurance costs deplete already very scarce resources. The majority's decision seems just as likely to force small-scale activity providers out of business as it is to encourage such providers to obtain insurance coverage.
If pre-injury releases are to be banned or regulated, it should be done by the Legislature so that a statute can set universally applicable standards and definitions. When the Legislature acts, all are given advance notice before a minor's participation in an activity as to what is regulated and as to whether a pre-injury release is enforceable. In contrast, the majority's present opinion will predictably create extensive and expensive litigation attempting to sort out the bounds of commercial activities on a case-by-case basis.
The majority opinion also does not explain the reason why after years of not finding pre-injury releases to be against public policy, it today finds a public policy reason to rule pre-injury releases unenforceable when the Legislature has not done so. Again, the present majority opinion conflicts with the reasoning expressed just three years ago in Shea:
Further, the lack of a statutory requirement for court involvement in pre-injury arbitration agreements provides a basis for treating these agreements differently from settlements of lawsuits involving minors' claims, for which appointment of a guardian ad litem and court approval are necessary under certain circumstances pursuant to sections *364 744.301 and 744.387, Florida Statutes (2004). The Legislature has chosen to authorize court protection of children's interests as to extant causes of action, but has not exercised its prerogative as parens patriae to prohibit arbitration of those claims.
908 So.2d at 403. Similarly, though the Legislature has acted in respect to the settlement of accrued claims, the Legislature has not acted in respect to pre-injury releases. There can be no question that the Legislature adopts legislation when it concludes that the interests of minors are best served by statutory protection. The Legislature has chosen to act in respect to many matters in which the Legislature concluded that minors should have the protection of a guardian ad litem. See Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Petersen, 920 So.2d 75, 78 (Fla. 1st DCA 2006) (listing circumstances in which trial court may or must appoint a guardian ad litem: § 39.402(8)(c) (shelter hearings); § 39.807(2)(a) (termination of parental rights proceedings); § 73.021(4) (eminent domain proceedings); § 390.01115(4)(a) (termination of pregnancy without parental notification); § 731.303(4) (probate proceedings); § 743.09(3) (contract for artistic or creative services or professional sport contract); § 744.446 (parental conflict of interests with minor child), Florida Statutes (2004)). Thus, as we did in respect to arbitration agreements, it is reasonable to conclude that the Legislature has chosen not to act in respect to pre-injury releases.
The Legislature may have chosen not to act on the issue of pre-injury releases out of respect for the authority of parents to make choices involving their children, which again we recognized in Shea:
Parents' authority under the Fourteenth Amendment and article I, section 23 [of the Florida Constitution] encompasses decisions on the activities appropriate for their childrenwhether they be academically or socially focused pursuits, physically rigorous activities such as football, adventure sports such as skiing, horseback riding, or mountain climbing, or, as in this case, an adventure vacation in a game reserve. Parents who choose to allow their children to engage in these activities may also legitimately elect on their children's behalf to arbitrate a resulting tort claim if the risks of these activities is realized.
908 So.2d at 404. Without the ability to execute pre-injury releases, a parent may find that his or her minor child will not be able to participate in activities because the operators of the activities will not accept the financial exposure of the minor's participation, regardless of whether the parent would decide that the benefit to the minor outweighed the risk of injury.
The majority opinion raises other serious questions. If a parent does not have the authority to execute a pre-injury release, does a parent have the authority to execute an enforceable consent for medical treatment on behalf of a minor child? Florida courts have long recognized the authority of the parent to execute an enforceable consent for medical treatment on behalf of a minor child, see Ritz v. Fla. Patient's Comp. Fund, 436 So.2d 987, 989 (Fla. 5th DCA 1983) (holding that parent could consent to medical treatment on behalf of incompetent child), but medical consents and pre-injury releases have substantial similarities. Plainly, without the giving of consent, health care providers in most instances will not provide medical services. The majority's decision also calls into question whether a parent has authority to turn down an offer of settlement for an injury to a minor as was upheld in Petersen.
In sum, I conclude that the questions presented by this case demonstrate a need *365 for the Court to exercise judicial restraint, recognize that the Legislature is the policy-making branch of government, and defer to the Legislature by respecting the Legislature's non-action to date.
NOTES
[1] The Fourth District also certified conflict with the decision of the Fifth District Court of Appeal in Lantz v. Iron Horse Saloon, Inc., 717 So.2d 590 (Fla. 5th DCA 1998). However, subsequent to its decision in Lantz and subsequent to the certification of conflict, the Fifth District decided Applegate v. Cable Water Ski, L.C., 974 So.2d 1112 (Fla. 5th DCA 2008), where the Fifth District aligned itself with the Fourth District in Kirton. For those reasons and because the Fourth District certified a question providing us with an independent basis for jurisdiction, we do not address the certified conflict.
[2] We answer the certified question as to pre-injury releases in commercial activities because that is what this case involves. Our decision in this case should not be read as limiting our reasoning only to pre-injury releases involving commercial activity; however, any discussion on pre-injury releases in noncommercial activities would be dicta and it is for that reason we do not discuss the broader question posed by the Fifth District.
[3] Mr. Jones filed an affidavit in support of the Kirtons' motion for summary judgment. In that affidavit, he admitted that he willfully and with full understanding executed the release on behalf of his minor child at Thunder Cross Motor Sports Park. He also stated that he understood that it was his intention to waive the right to sue for the death of Christopher and to be banned by the other terms as set forth in the general release. He further stated that he understood that by signing the general release, he was forever discharging the Kirtons for any and all loss or damage and any claim or demands on account of injury to Christopher or his property or resulting in the death of Christopher arising out of or related to the events, whether caused by the negligence of the releasees or otherwise.
[4] The American Motorcyclist Association.
[5] This Court in Shea found such a distinction arbitrary as applied to parents' agreements to arbitrate but, in doing so, noted that it would not address this distinction as applied to pre-injury releases. Shea, 908 So.2d at 403-04 & n. 9.
[6] This Court noted at the beginning of its decision that the issue, as phrased by the Fourth District, only touched "upon binding arbitration and not on any broader contractual waiver of a tort claim brought on behalf of a minor." Id. at 394. It also distinguished pre-injury releases from arbitration agreements: "Whether a parent may waive his or her child's substantive rights is a different question from whether a parent may agree that any dispute arising from the contract may be arbitrated rather than decided in a court of law." Id. at 401. We emphasized this distinction by noting that the nature of the waiver, whether it concerns a waiver of a legal claim or right or a waiver of the forum in which the claim is presented, "is a crucial consideration in determining whether the state's interest in protecting children renders the waiver unenforceable." Id. at 403.