LEVINE, J.,
concurring in part and dissenting in part.
I agree with the majority’s finding that the trial court correctly denied a directed verdict for Claire’s on the Locastros’ negligence claim, as the Locastros presented sufficient evidence of causation to establish a prima facie claim of negligence. However, I respectfully disagree with the majority’s conclusion that the trial court erred in granting summary judgment for Claire’s on its claim of contractual indemnity. I agree with the majority’s certification to the supreme court.
The majority relies on a line of cases which states that parents are generally immune from tort claims brought by their children. See generally Herzfeld v. Herzfeld, 781 So.2d 1070 (Fla.2001) (describing the doctrine of parental immunity); Ard v. Ard, 414 So.2d 1066, 1069 (Fla.1982) (expressing policy of avoiding “depletion of the family assets at the expense of the other family members”). Applying these cases, the majority makes Ms. Locastro, as the parent, immune from any counterclaims asserted by Claire’s, the third party, for injuries sustained by Alexis due to Claire’s negligence. These arguments are, of course, very appealing. “To reduce the available assets of the family ... is to reduce the amount available for support, education, and protection of the family as a whole.” Ard, 414 So.2d at 1067. Such an *1201 “intrusion ... might adversely affect the family relationship.” Id.
It is important to note, however, that Ms. Locastro freely executed this indemnity agreement. Parties are free to negotiate contracts for indemnity. See Horowitz v. Laske, 855 So.2d 169,174 (Fla. 5th DCA 2008) (“The right to indemnity arises through express or implied contract.”). Although Florida courts generally “view with disfavor contracts that attempt to indemnify a party against its own negligence,” such a contract will be upheld where the language in the indemnification provision states in “clear and unequivocal terms” that the party’s intent is to indemnify another for the indemnitee’s own tor-tious acts. Zeiger Crane Rentals, Inc. v. Double A Indus., Inc., 16 So.3d 907, 914 (Fla. 4th DCA 2009).
While the majority is persuaded by the “public policy” behind the parental immunity doctrine, I find other considerations to be more persuasive. The Florida Supreme Court once explained as follows:
When a particular contract, transaction, or course of dealing is not prohibited under constitutional or statutory provision, or prior judicial decision, it should not be struck down on the ground that it is contrary to .public policy, except it be clearly injurious to the public good or contravene some established interest of society. Courts, therefore, should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract between parties sui juris.
Bituminous Cas. Corp. v. Williams, 154 Fla. 191, 17 So.2d 98, 101-02 (1944) (citations omitted); accord Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So.2d 306, 311-12 (Fla.2000). While the majority has highlighted a generalized public policy concern that would invalidate the indemnity agreement, the freedom of contract would weigh, on the other hand, in favor of enforcing the indemnification agreement at issue.
“A fundamental tenet of contract law is that parties are free to contract, even when one side negotiates a harsh bargain.” Barakat v. Broward Cnty. Hous. Auth., 771 So.2d 1193, 1195 (Fla. 4th DCA 2000); accord Posner v. Posner, 257 So.2d 530, 535 (Fla.1972) (“Freedom to contract includes freedom to make a bad bargain.”). Ms. Locastro freely entered this agreement in exchange for the services provided to Alexis. Her signature on the document was not procured by fraud or duress. Ms. Locastro was free not to enter into this contract. See Yachting Promotions, Inc. v. Broward Yachts, Inc., 792 So.2d 660, 663 (Fla. 4th DCA 2001) (noting that the “freedom of contract entails the freedom not to contract”) (citation omitted). Ms. Locas-tro did not have to utilize the services of Claire’s for her daughter and could have walked away from the transaction. She did not, and instead she executed the contract.
The law cannot and will not presume that a party intended to form an illegal or unenforceable contract. Neiman v. Galloway, 704 So.2d 1131, 1132 (Fla. 4th DCA 1998) (citing Edwards v. Miami Transit Co., 150 Fla. 315, 7 So.2d 440, 442 (1942)). Likewise, I will not assume that Ms. Lo-castro entered into an illegal contract, and this court should not relieve Ms. Locastro of her contractual duties because her agreement “turn[ed] out to be a bad bargain.” Barakat, 771 So.2d at 1195.
The indemnity agreement signed by Ms. Locastro with the indemnification provision is an otherwise valid contract, and *1202 there is no statutory or precedential reason not to enforce it. Ms. Locastro admitted to signing the indemnity form provided to her by Claire’s. She should be held to her obligation, notwithstanding our desire to empathize with her situation.
Further, the trial court enforced the indemnification against Ms. Locastro as an individual, not against Ms. Locastro as Alexis’s mother. The monies awarded for Alexis as a judgment in this case would be separate and distinct from the judgment awarded for Claire’s as a result of the indemnity agreement signed by Ms. Locas-tro as an individual. Ms. Locastro may not use these funds to satisfy her own obligations and may use those funds to support Alexis only with court authorization. §§ 744.361(6)(a), 744.397(8), Fla. Stat. Thus, a judgment against Ms. Locastro does not vitiate the judgment in favor of Alexis.
The majority references Kirton v. Fields, 997 So.2d 349 (Fla.2008). Kirton stands for the proposition that a “pre-injury release executed by a parent on behalf of a minor child is unenforceable against the minor or the minor’s estate in a tort action arising from injuries resulting from participation in a commercial activity.” Id. at 358. The Florida Supreme Court asserted that the “parent’s decision in signing a pre-injury release impacts the minor’s estate and the property rights personal to the minor.” Id. at 357 (citation omitted). In the present case, the trial court protected the rights of the minor by finding the indemnity provisions valid against Ms. Locastro individually, not in her capacity as a parent. Again, the judgment entered on behalf of Alexis was separate and distinct from any monies the trial court determined that Ms. Locastro owed in her individual capacity to indemnify Claire’s. By safeguarding the judgment entered on behalf of Alexis, the trial court followed the spirit and the letter of Kirton by protecting the property rights of the minor child.[4] Id. at 357-58.
I also disagree with the majority’s conclusion that the issue in this case involves the doctrine of parens patriae, as the parent-child relationship is not per se involved. This case does not involve a situation where a child has sued her parent. Instead, the child sued a third party, and the third party asserted a counterclaim against the parent. While the state can intervene in the parent-child relationship in limited instances when necessary to protect the child, the state has no legal authority to intervene in a contract between *1203 Ms. Locastro individually and Claire’s. Though Kirton relied on the doctrine of parens patriae, Kirton involved a parent signing a waiver on the child’s behalf. Thus, the parent-child relationship was involved. In contrast, Ms. Locastro, by signing the indemnification agreement, bound only herself.
The majority also suggests that the enforcement of executed and enforceable indemnification agreements could possibly discourage parents from pursuing lawsuits on behalf of their children. Of course, this speculation, which may or may not prove to be true, still does not overcome the basic premise that Ms. Locastro would not have had to confront this decision of whether to pursue a lawsuit if she had not utilized the services offered, if she had not executed the indemnification agreement, or if she found a business that did not require the execution of such an agreement. After all, piercing services are hardly the type of services that constitute adhesion contracts. Ms. Locastro and Alexis could have kept walking in the mall from this business to another store for the services, or they could have skipped having Alexis’s ear cartilage pierced altogether.[5]
I would note that the majority’s invalidation of a freely executed indemnification agreement as an extension of “public policy” is a decision that would be best determined by the legislature.[6] It is axiomatic that the courts are not in the best position to determine the most effective course for the furtherance and extension of public policy as a whole.[7] Further, court decisions should not turn on “the philosophy or predilection of judges as to what the law ought to be.” Ball v. Branch, 154 Fla. 57, 16 So .2d 524, 525 (1944).
If the legislature wanted to foreclose the use of indemnification agreements by parents when contracting with third parties for services for their minor children, then the legislature would have acted. For instance, the Florida Supreme Court noted that “[t]he Legislature has chosen to authorize court protection of children’s interests as to [the settlement of] extant causes of action, but has not exercised its prerogative as parens patriae to prohibit arbitrá *1204 tion of those claims.” Global Travel Mktg., Inc. v. Shea, 908 So.2d 392, 403 (Fla.2005). In Shea, the court upheld an arbitration agreement signed by the parent on behalf of a minor child or minor child’s estate arising out of a tort action. “In the absence of legislation restricting agreements to arbitrate the potential claims of minors, enforcement of these agreements in commercial travel contracts is not contrary to the public policy of protecting children.” Id. at 405. It is significant that in Shea, the Florida Supreme Court found that the absence of legislative restriction was effectively an approval of arbitration agreements executed by parents on behalf of their children.
The legislature has, in fact, acted in response to Kirton. Section 744.301, Florida Statutes, has been recently amended to authorize a parent “to waive and release, in advance, any claim or cause of action against a commercial activity provider ... which would accrue to a minor child for personal injury, including death, and property damage resulting from an inherent risk in the activity.”[8] § 744.301(3), Fla. Stat. (2010). At the same time, the legislature also implicitly excluded from this explicit grant of power the right of a parent to waive his or her child’s negligence claims against the activity provider. § 744.301(3)(a)2., Fla. Stat. It is clear that the legislature can give statutory guidance regarding settlement of a minor’s legal claims, as demonstrated by Shea. The legislature has also offered guidance by specifying a class of claims that a parent may waive, as evidenced by the statute enacted in response to Kirton. In the present case, the legislature has not exercised that same authority to prohibit parents from signing indemnification agreements with third parties who provide commercial services to minors. One could postulate, based on Shea, that the lack of legislative restriction could be just as reasonably interpreted as an approval of the indemnification agreement at issue in the present case.
The majority states that “public policy concerns regarding the parent-child relationship and parental immunity and releases” have “developed over the last hundred years as part of the common law.” Although it is true that the courts in general, when interpreting the common law, may “properly extend old principles to new conditions,” it is also equally true that “it is the province of the legislature and not of the court to modify the rules of the common law.” State v. Egan, 287 So.2d 1, 6 (Fla.1973). In Egan, the Florida Supreme Court concluded that “[ujnder our constitutional system of government, however, courts cannot legislate. They cannot abrogate, modify, repeal, or amend rules long established and recognized as parts of the law of the land.” Id. at 7.
In the past when courts “extended” common law principles to newer conditions,
the prevailing image of the common law was that of a preexisting body of rules, uniform throughout the nation (rather than different from state to state), that judges merely “discovered” rather than created. It is only in this century ... that we came to acknowledge that judges in fact “make” the common law, and that each state has its own.
Antonin Scalia, Commorv-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution & Laws, in A Matter of In *1205 terpretation: Federal Courts & the Law 10 (Antonin Scalia & Amy Gutmann eds., 1997). Thus, as Justice Souter has stated, “in most cases where a court is asked to state or formulate a common law principle in a new context ... the law is not so much found or discovered as it is either made or created.” Sosa v. Alvarez-Ma-chain, 542 U.S. 692, 725, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
However, Justice Scalia recognized the inevitable tension in the “uncomfortable relationship of common-law lawmaking to democracy (if not to the technical doctrine of the separation of powers).” Scalia, supra, at 10. Recognizing this tension, judges have long acknowledged that courts are not free agents in how they decide cases and apply the common law which has developed over time. As then-Judge Cardozo explained:
The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, metho-dized by analogy, disciplined by system, and subordinated to the “primordial necessity of order in the social life.” Wide enough in all conscience is the field of discretion that remains.
Benjamin N. Cardozo, The Nature of the Judicial Process 141 (1921) (footnote omitted). The judge is constrained by the history and experience of the applicable common law principle. “The life of the law has not been logic — it has been experience.” Oliver Wendell Holmes, The Common Law 1 (1881). Thus, the foundation of the common law is the actual customs and practices of the people over time. “Indeed, it is contrary to our common-law experience not to bring the common law into accord with the actual customs and practices of its citizens.... ” Woodman, 785 N.W.2d at 44 (Markman, J., concurring). There is no evidence in this record that demonstrates that the execution of an indemnification agreement by a parent on behalf of her child is inconsistent with the actual custom or practices of the citizenry of this state.
To “create” new extensions in the common law by invalidating an otherwise valid indemnity provision in the absence of any legislative guidance would be to impose a “preferable” or more “equitable” result by judicial fiat, to the detriment of the enforcement of a freely negotiated contract. As Justice Holmes once stated,
Nowhere is the confusion between legal and moral ideas more manifest than in the law of contract.... The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, — and nothing else. If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are liable to pay a compensatory sum unless the promised event comes to pass, and that is all the difference.
Oliver Wendell Holmes Jr., The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897). As “harsh” as the result may appear, I find no legal reason to find the indemnity agreement unenforceable, and Ms. Locas-tro should therefore be liable to Claire’s pursuant to the agreement she freely executed.
For all the foregoing reasons I would affirm the judgment of the trial court in its entirety.
MAY, C.J., DAMOORGIAN, GERBER and CONNER, JJ., concur.

. The majority places reliance on the supreme court's citation of Johnson v. New River Scenic Whitewater Tours, Inc., 313 F.Supp.2d 621 (S.D.W.Va.2004). In Johnson, the court held that an activity provider who violates a state safety statute and causes harm to a minor cannot enforce an indemnity agreement executed by the parent. Claire’s has not been accused of failing to comply with a comparable legislative enactment. Moreover, the court in Johnson was not professing the public policy of any jurisdiction. That court merely "predict[ed] what [the West Virginia Supreme Court] would decide were it confronted with this issue.” Id. at 631. A federal-court sitting in diversity "write[s] in faint and disappearing ink,” because its opinion is little more than an educated guess rather than a definitive pronouncement of state law or policy. McMahan v. Toto, 311 F.3d 1077, 1079-80 (11th Cir.2002) (citation omitted).
The majority also relies on Childress ex rel. Childress v. Madison County, 777 S.W.2d 1, 7 (Tenn.Ct.App.1989), which recognized the “good and logical reasons for giving effect to exculpatory and indemnification clauses executed by parents and guardians on behalf of infants and incompetents. Risk is inherent in many activities that make the lives of children richer. A world without risk would be an impoverished world indeed.” The Childress court postulated that if the rule they annunci-ated was "other than as it should be, we feel the remedy is with the Supreme Court or the legislature.” Id. at 8.

.Justice Markman of the Michigan Supreme Court, commenting on the parent-child relationship, has stated:
The common-law rule that parents are empowered to make important decisions regarding their children was recognized in In re Rosebush, 195 Mich.App. at 682-683, 491 N.W.2d 633 [ (Mich.Ct.App. 1992)]. See also In re L.H.R., 253 Ga. 439, 445, 321 S.E.2d 716 ([Ga.] 1984) ("The right of the parent to speak for the minor child is ... imbedded in our tradition and common law_"). Moreover, as previously indicated, caselaw holds that parents are presumed to act in the best interests of their children and are entitled to make judgments and decisions concerning risks to their children.
[[Image here]]
A majority of the justices forbid parents under all circumstances to undertake even a perfectly rational decision to assess the risks and benefits when determining what is in the best interests of their children. Instead, such decision-making will now be monopolized by judges, and the answer will always be the same: "No. The parent cannot be permitted to make such a determination.”
Woodman ex rel. Woodman v. Kera LLC, 486 Mich. 228, 785 N.W.2d 1, 36-37 (2010) (Markman, J., concurring).

. The separation of governmental powers was aptly described by Justice Pariente as being the "cornerstone of American democracy.” Bush v. Schiavo, 885 So.2d 321, 329 (Fla. 2004).

. Legal commentators have, at times, written about the intended and unintended consequences of judicial decisions. For instance, at least one writer has opined on the effects of Kirton. Jordan A. Dresnick, The Minefield of Liability For Minors: Running Afoul of Corporate Risk Management in Florida, 64 U. Miami L. Rev. 1031, 1058 (2010).

. The amendment is a direct response to the holding in Kirton. Fla. S. Comm, on Judiciary, CS/SB 2440 (2010) Staff Analysis 10 (Mar. 21, 2010) (on file at http://www. myfloridahouse.gov/). Although not directly addressed by the senate bill, the legislature acknowledged the fact that "indemnification clauses” are "[e]xculpatory clauses [that] extinguish or limit liability.” Id. at 4.