On Motions fob Rehearing, Rehearing En Banc, and fob Certification

POLEN, J.
We grant appellant/cross-appellee, Claire’s Boutiques, Inc. (Claire’s) motion to consider this case en banc, and for certification. Upon en banc consideration, the following is the opinion of the court:
We are presented with two issues that are the subject of this appeal and cross-appeal: whether the trial court correctly denied a directed verdict for Claire’s on the Loeastros’ negligence claim and whether the trial court correctly entered summary judgment for Claire’s on its claim of contractual indemnity. We affirm the trial court’s denial of Claire’s motion for a directed verdict on the Loeastros’ negligence claim but reverse the trial court’s entry of summary judgment on Claire’s claim of contractual indemnity.
In August 2006, Amy Locastro took her thirteen-year-old daughter, Alexis, to Claire’s to get Alexis’s ear cartilage pierced. After the piercing, Alexis developed an infection in the cartilage of the ear that required hospitalization and extensive medical treatment. Alexis’s ear has been permanently disfigured.
At trial, the Loeastros introduced evidence of the ear piercing process used at Claire’s. All employees watched a video prior to being permitted to pierce a customer’s ears. The video did not provide any training on sterilization of equipment. Employees, however, were instructed as to the increased risks regarding piercing of cartilage and the longer healing period required. Finally, employees were required to receive a perfect score on a written test before being permitted to perform ear piercings. Stacy Smith, the loss prevention manager for Claire’s, further testified as to the piercing procedure. She testified that employees would use gloves and alcohol wipes to clean a customer’s ears and the ear piercing instrument. An employee would then mark the area to be pierced with a surgical pen, but Claire’s employees were not required to sterilize the surgical pen between customers.
*1194 The employee who performed the piercing on Alexis, Erica Stokes, may or may not have had such training. No evidence of her training or testing was found in her employee file. No one at trial testified to training Stokes or seeing proof of such prior training. Ms. Locastro also testified to not seeing Stokes wash her hands prior to piercing her daughter’s ear.
A disclosure form was signed by Ms. Locastro that included a release from liability provision, as well as an indemnity provision. Ms. Locastro agreed to the following provisions:
I am the parent or legal guardian of a minor under 18 years of age, and I hold only myself liable and hereby release and waive any and all claims that I or the minor may make as a result of this ear piercing. I further agree that I shall indemnify and hold Claire’s harmless with respect to any and all claims that I or my minor child may make as a result of this ear piercing, even if due to the sole or joint negligent acts or omissions of Claire’s Boutiques, Inc., its agents, or employees.
In the same form, Ms. Locastro acknowledged the aftercare requirements of a cartilage piercing, although Alexis testified that she was not instructed about the care for her piercing after the procedure. Ms. Locastro and Alexis both testified to cleaning the ear cartilage around the piercing for days after the piercing. Although there was some redness and swelling, Ms. Locastro did not notice anything unusual until Alexis complained about pain in the ear at a doctor’s office nine days after the piercing. Alexis’s doctor, Dr. Jantunen, prescribed an antibiotic for the infection. A few days later, with the pain continuing, Dr. Jantunen instructed Alexis to continue taking antibiotics. After a third visit, Dr. Jantunen referred Alexis to a specialist. The specialist immediately sent her to the emergency room, where the wound in her ear was drained due to a severe infection. Surgery was performed on her ear, and Alexis remained in the hospital for eight or nine days. Alexis testified to having no feeling in the top of the ear. At trial, there was medical testimony that Alexis suffered permanent cartilage deformities as a result of the infection.
At trial, Dr. Jantunen’s deposition testimony was entered into evidence. He stated that it was inappropriate for Claire’s to reuse a surgical marking pen without having it sterilized and that it was negligent for employees to pierce ears without washing their hands. Dr. Jantunen felt, at a minimum, Claire’s should have had a hand-washing sink at the piercing station. Dr. Jantunen concluded that the infection and resulting damage was “most probably caused by the ear piercing” within a reasonable degree of medical probability, and Claire’s negligence made the infection more likely to occur.
Dr. Nachman, a pediatric infectious disease specialist, testified that she did not believe that Alexis’s infection could have been caused by the surgical marking pen. Likewise, she believed the infection could not have been caused by hand contamination since the type of bacteria causing Alexis’s infection does not “colonize on your hands.” Moreover, this type of bacteria would have recolonized the area within one day, so the fact that Alexis’s infection did not manifest for several days indicates the bacteria came from another source. Dr. Nachman concluded that Claire’s had “nothing to do” and was not associated “in any way” with Alexis’s infection.
After a trial, the jury returned a verdict for Alexis, finding Claire’s 75% negligent. The jury awarded Alexis $7,012 in past medical expenses, $72,987 in past pain and suffering and $20,000 in prospective damages. The final judgment against Claire’s *1195 was for $69,740. The trial court denied a motion for new trial on the negligence claim.
Separate from the trial of the negligence claim, Claire’s filed a cross-motion for summary judgment to compel Ms. Locas-tro to indemnify Claire’s for the negligence claim pursuant to the agreement. Ms. Locastro also filed a motion for summary judgment, claiming that she was immune from liability because she did not have liability insurance and parents are “immune from suit by their children and could be held liable only to the extent of available liability coverage.” The trial court found the indemnity provisions valid against Ms. Locastro in her individual capacity, but not in her capacity as Alexis’s mother, and entered a judgment against Ms. Locastro for $200,274, inclusive of defense costs, attorney’s fees, and the judgment against Claire’s. From the denial of the motion for directed verdict and motion for new trial on the claim of negligence and the summary judgment on the enforcement of the indemnity provision, this appeal ensues.
A trial court’s order on a motion for a directed verdict is to be reviewed de novo on appeal. Dep’t of Children & Family Servs. v. Amora, 944 So.2d 431, 435 (Fla. 4th DCA 2006). A directed verdict is improper if “any evidence” will support a verdict for the non-moving party. Id. The trial court should direct a verdict in favor of the defendant only “where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference.” McCain v. Fla. Power Corp., 593 So.2d 500, 504 (Fla.1992).
In the present case, Claire’s urges that a directed verdict should have been granted since there was insufficient evidence that its actions “caused” the infection and resulting injuries. In negligence cases, like the present one, “Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiffs injury.” Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla.1984). If sufficient evidence is offered to meet this standard, the remaining questions of causation are to be resolved by the trier of fact. Wallace v. Dean, 3 So.3d 1035, 1047 n. 18 (Fla. 2009).
The Florida Supreme Court in Gooding cited to Professor Prosser as to the plaintiffs burden of proving causation:
On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.
Gooding, 445 So.2d at 1018 (quoting William Prosser, Law of Torts § 41 (4th ed. 1971)). “In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome.” Id. at 1020. Expert testimony is not an absolute requirement to establish causation. See Atkins v. Humes, 110 So.2d 663, 666 (Fla.1959) (“[J]urors of ordinary intelligence, sense and judgment are, in many cases, capable of reaching a conclusion, without the aid of expert testimony... .”); State Farm Mut. Auto. Ins. Co. v. Penland, 668 So.2d 200, 202-03 (Fla. 4th DCA 1995) (“[T]he opinion of an expert should be excluded where facts testified to are of a kind that do not require any special knowledge or experience in order to form a conclusion.”). If a plaintiff does offer expert testimony, the expert need not incant any talismanic phrases to survive a motion for directed verdict, and the expert’s testimony should be considered as a whole. See Edwards v. Simon, 961 So.2d 973, 974-75 (Fla. 4th DCA 2007) (finding a *1196 medical expert’s testimony on the standard of care sufficient to withstand summary judgment where the expert never specifically opined as to whether the physician’s actions fell below the standard of care).
Based upon the testimony of Dr. Jantunen, there was evidence that the actions of Claire’s in failing to have a sink with warm water for hand washing and in failing to sterilize the reusable surgical marker in between uses was a substantial factor in bringing about Alexis’s injury. In addition, there was also Ms. Loeastro’s testimony of Stokes’s failure to wash her hands before the piercing. Together, this would be a sufficient quantum of “any evidence” of causation to survive a directed verdict. Simply, the testimony of the Claire’s employees, Dr. Jantunen, Ms. Lo-castro, and Alexis presented sufficient evidence that the trial court did not err when it denied Claire’s motion for directed verdict and motion for new trial. While Dr. Nachman disagreed with Dr. Jantunen, her testimony created an issue of fact for the jury to resolve. Considering all of the evidence presented at trial, we cannot conclude that the facts are so “unequivocal” that the evidence “supports no more than a single reasonable inference” regarding causation. Accordingly, we affirm the order denying a directed verdict for Claire’s.
As to the issue raised on cross-appeal, the trial court’s entry of summary judgment in favor of Claire’s on its claim of contractual indemnity, we reverse. We conclude that a parent’s indemnification of a third party for the third party’s negligent conduct causing injury to the parent’s child violates public policy.
This indemnification agreement between a commercial activity provider and a parent, requiring the parent to indemnify the commercial entity for its own negligence when the commercial provider injures the child of the parent, is invalid. Such an onerous provision conflicts with the public policy expressed in Kirton v. Fields, 997 So.2d 349 (Fla.2008), that requires the state “to assert its role under parens patri-ae to protect the interests of the minor children” where a parent’s release, or in this case indemnity, would impact a child’s well-being and leave a parent with the prospects of bearing the financial burden caused by the negligence of the activity provider, thus protecting only that provider’s interest and not the overall welfare of the child. It also conflicts with the public policy pronouncements of both Ard v. Ard, 414 So.2d 1066 (Fla.1982), and Joseph v. Quest, 414 So.2d 1063 (Fla.1982).
Parents are generally immune from tort claims brought by their children. Herzfeld v. Herzfeld, 781 So.2d 1070, 1072 (Fla.2001). Such immunity has been premised on public policies that favor harmonious familial relations and parental discretion over discipline while discouraging the depletion of family resources from frivolous suits, among others. Id. at 1072-73, 1076-77. “To reduce the available assets of the family through a straight suit is to reduce the amount available for support, education, and protection of the family as a whole.” Ard v. Ard, 414 So.2d 1066, 1067 (Fla.1982).[1] Ard also teaches that:
Protecting the family unit is a significant public policy behind parental immunity. We are greatly concerned by any intrusion that might adversely affect the family relationship. Litigation between family members would be such an intrusion.
*1197 In a case decided on the same day as Ard, the supreme court held that a parent could be liable for contribution where the parent’s negligence was a cause of injury to the child but only to the extent of existing liability insurance coverage for the parent’s tort against the child. The court further explained why a parent should not be generally liable for contribution for injuries sustained by their children:
Minors and infants must bring suits through a representative, next friend, or guardian ad litem. Fla.R.Civ.P. 1.210(b). See Youngblood v. Taylor, 89 So.2d 503 (Fla.1956). Logically, an infant injured through the combined negligence of a parent and a third party would in most cases bring suit through his parents. If the parents feared possible liability through contribution then it would be their decision and not the child’s to withhold suit.
Any award that the child received would be his and not a part of the family treasury. The parents would be responsible for using it for the child’s welfare or holding the award in trust for the child until he reached the age of majority. And, of course, the parents could not use any of that money as a setoff for their liability. This fact alone can cause a chilling effect on the parents when considering whether to sue where their own negligence is a factor.
Joseph v. Quest, 414 So.2d 1063, 1064 (Fla. 1982). Thus, public policy prohibits even a negligent parent from being compelled to contribute to his or her child’s damages because of the strain it would place on the family relationship.
This is even truer with an indemnification agreement such as the one in this case. Under this agreement, not only would the non-negligent parent be responsible for the entire amount of the child’s damages, thus depleting the family treasury, but Amy, the mother, is also required to repay all of Claire’s costs and legal fees, which in this case amounted to almost three times the amount of damages. Thus, for a $72,000 damage award, Amy is liable for over $200,000. What parent would even attempt to bring suit when the recovery would be so catastrophic to the family fortunes? Thus, the burden of the provider’s negligence would fall, not on the responsible party, but on the family and, if they could not provide for the injured child, on the state and its taxpayers. When the agreement induces a parent to act contrary to the child’s welfare, the state as parens patriae must step in and void such an agreement.
Kirton v. Fields also compels this result, as its public policy pronouncements relating to the prohibition of parental releases for injuries to children by negligent commercial providers applies as well to parental indemnity agreements. In Kirton, our supreme court held that public policy concerns preclude parents from executing a pre-injury release on behalf of a minor or the minor’s estate in a tort action arising from injuries suffered in participating in a commercial activity. The court noted that a majority of other states have held that such releases are unenforceable. The court hearkened back to the same public policy arguments made in Herzfeld involving the problem of the financial burden to the family where a release precludes a minor from recovering for injuries suffered through a third party’s negligence:
It cannot be presumed that a parent who has decided to voluntarily risk a minor child’s physical well-being is acting in the child’s best interest. Furthermore, we find that there is injustice when a parent agrees to waive the tort claims of a minor child and deprive the child of the right to legal relief when the child is injured as a result of another party’s negligence. When a parent executes such a release and a child is in *1198 jured, the provider of the activity escapes liability while the parent is left to deal with the financial burden of an injured child. If the parent cannot afford to bear that burden, the parties who suffer are the child, other family members, and the people of the State who will be called on to bear that financial burden.
Kirton, 997 So.2d at 357.
When a parent agrees to indemnify the third party for its negligence causing injury to the minor child, the same burden shifting occurs. Indemnification “shifts the entire loss from one ... to another who should bear the costs” for damages resulting from tortious activity. Houdaille Indus., Inc. v. Edwards, 374 So.2d 490, 493 (Fla.1979). Indemnification may be arranged by contract, whereby “the promisor agrees to protect the prom-isee against loss or damages by reason of liability to a third party.” Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 643 (Fla.1999).
Kirton leads to the conclusion that a parental indemnification agreement is vio-lative of public policy. In reaching its result, Kirton cited with approval to a number of out-of-state cases holding parental releases unenforceable, which cases also disapproved of parental indemnification agreements based upon public policy. In Johnson v. New River Scenic Whitewater Tours, Inc., 313 F.Supp.2d 621 (S.D.W.Va.2004), the court held that a parent could neither waive liability on behalf of his child nor indemnify a third party against the parent’s minor child for liability for conduct that violated a state safety statute. Id. at 631-32. The court in Johnson also recognized a necessary tension that would arise if an indemnification agreement like that in the instant case were enforced:
[Allowing a parent to indemnify a third party for its tortious conduct towards the parent’s minor child would result in a serious affront to the doctrine of parental immunity. If a parent could enter into a binding contract of indemnification regarding tort injuries to her minor child, the result would be that the child, for full vindication of his legal rights, would need to seek a recovery from his parent. This would clearly abrogate the strong West Virginia public policy to “preserve the peace and tranquility of society and families by prohibiting such intra-family legal battles.”
Id. at 632 (citations omitted).
In Childress By and Through Childress v. Madison County, 777 S.W.2d 1 (Tenn. App.1989), also cited in Kirton, the court likewise declared a parental indemnity agreement invalid as against public policy, stating that indemnity provisions were on a similar footing with pre-injury releases. The court noted the conflict which would arise between the parent and child where the parent must indemnify the tortfeasor:
Indemnification agreements executed by a parent or guardian in favor of tort feasors, actual or potential, committing torts against an infant or incompetent, are invalid as they place the interests of the child or incompetent against those of the parent or guardian. See Valdimer v. Mt. Vernon Hebrew Camps, Inc., 9 N.Y.2d 21, 210 N.Y.S.2d 520, 172 N.E.2d 283, 285 (1961). “Clearly, a parent who has placed himself in the position of indemnitor will be a dubious champion of his infant child’s rights.” Id.See also Ohio Casualty Insurance Co. v. Mallison, 223 Or. 406, 354 P.2d 800, 802-803 (1960).
Childress, 777 S.W.2d at 7.
Finally, Kirton cited to Hawkins ex rel. Hawkins v. Peart, 37 P.3d 1062 (Utah 2001), which also held that a parental indemnity agreement was against public policy. First noting that the common law *1199 disfavors agreements to indemnify parties against their own negligence, the court agreed with the New York Court in Valdi-mer that an indemnity agreement places the parent and child at “cross-purposes” which would tend to motivate the parent to discourage the prosecution of the minor’s claim because of the financial burden it would place on the family unit, the same reasoning by which Kirton held the pre-injury release as violative of public policy. Moreover, Hawkins also held that the indemnity agreement was inconsistent with a parent’s duty to protect the child’s best interests.
We agree with these out-of-state cases and hold that they are consistent with the supreme court’s analysis in Kir-ton as well as being cited with approval by the court. Allowing a parent to agree to indemnify a third party for any damages suffered by her child seriously undermines the parent-child relationship and places undue financial burden on the family unit in the same way a pre-injury release compromises those same interests. Thus, such an indemnification agreement is void and unenforceable.
The dissent applies contractual principles and claims freedom of contract requires . that the indemnity agreement be upheld. But where that freedom interferes with a child’s welfare by reducing the ability of that child to find redress for the negligence of others, then the state as parens patrie must step in. That is what Kirton required with respect to the parental release of the minor’s claim, and the same public policy principles of Kirton, Ard, and Joseph compel the voiding of the indemnity agreement in this case.
The indemnification agreement is not merely a bad bargain as the dissent suggests. It is an agreement made by the parent which is injurious to the child’s best interest, harming a third party — the child. The indemnification agreement will make it likely that, when the child is injured, the parent as natural guardian will not initiate proceedings to recover for injuries, however grievous, because of the concern for the parent’s exposure to those damages. Joseph. If the child were rendered a quadriplegic as a result of a commercial provider’s negligence, who would pay for those expenses? Will the child’s life be compromised because of the parent’s agreement with the negligent activity provider? Will the state and its taxpayers be required to step in and pay for treatment? The indemnity agreement in this case makes the likely answer to those questions “yes.”
The dissent suggests that it is more appropriate to await legislative direction as to whether these indemnity agreements violate public policy. However, the public policy concerns regarding the parent-child relationship and parental immunity and releases developed over the last hundred years as part of the common law through court decisions. See Herzfeld, 781 So.2d at 1072. For most of that time, statutes have not been enacted to either codify or disaf-firm court decisions in this area. After Kirton, however, the legislature passed a statute to limit its holding by permitting parents to release a commercial activity provider for a child’s injuries occurring as a result of the inherent risk of the activity under certain circumstances. See § 744.301(3) Fla. Stat. (2010).[2] Those cir *1200 cumstances do not include releasing the commercial activity provider from liability for its own negligence. We think that this limited release clearly evinces a Legislative public policy choice that commercial providers should be liable for their own negligence when minors are injured. In fact, the Senate Staff analysis of the statutory amendment permitting limited releases states that “the bill does not recognize releases signed by natural guardians that waive negligence, gross negligence, or intentional conduct.” Fla. Staff An. S.B. 2440 3/17/2010. Thus, the legislature did not intend to permit commercial activity providers to avoid the consequences of their own negligence when children are injured, recognizing the essential holding of Kirton.[3] Validating this parental indemnity agreement would be contrary to that intention. Therefore, holding this agreement invalid is consistent with the expression of the public policy of this state through its statutes.
In respect to the arguments made by the dissent, and upon Claire’s motion, we certify the following question as being of great public importance:
Whether an indemnification agreement executed by a parent agreeing to indemnify a commercial activity provider for its own negligence in causing injury to the parent’s child is enforceable?

Affirmed in part; Reversed in part; Question Certified.

WARNER, STEVENSON, GROSS, TAYLOR and CIKLIN, JJ., concur.
LEVINE, J., concurs in part and dissents in part with opinion, in which MAY, C.J., DAMOORGIAN, GERBER and CONNER, JJ., concur.
HAZOURI, J., recused.

. Though the Florida Supreme Court has recognized an exception to the general rule of parental immunity for negligence actions brought by children where the parent is insured against the parent's own negligent conduct, this exception does not apply in the instant case because Ms. Locastro had no insurance which would cover the claim. Ard, 414 So.2d at 1067.

. Kirton involved the negligent activity of a commercial activity provider. As Justice An-stead noted in his concurrence, the holding of the majority opinion was narrow and directed at "commercial providers who wrongfully and negligently cause injury to a child but seek to be relieved of liability for their misconduct by securing a pre-activity release from the child's parent.” Id. at 358. Nevertheless, language in the majority opinion caused the Legislature’s concern over the impact of the decision on parental rights, thus *1200 permitting a parent to release a commercial provider for inherent risks of an activity.

. It should be noted that the original version of the statute introduced in the House of Representatives provided for parental waiver even for claims of negligence. See HB 285 (on file at www.myfloridahouse.gov). The House then adopted Senate Bill 2440 as a committee substitute, recognizing parental releases only for inherent risks of commercial activities. Id.